**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| LEROY TENNART, et al., | Case No. 17-cv-179-JWD-EWD |
| Plaintiffs |  |
| v. |  |
| CITY OF BATON ROUGE, et al., |  |
| Defendants |  |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

I.     **Introduction**

In the wake of Alton Sterling's killing by Baton Rouge Police officers on July 5, 2016, large numbers of people, overwhelmingly Black residents of the Baton Rouge area, assembled to protest Mr. Sterling's death and the treatment of Black people by Baton Rouge area law enforcement.

When the Plaintiffs in this case joined their neighbors near the Baton Rouge Police Department headquarters at various times early in the weekend of July 8–10, the protests were being met by a combined, coordinated group of law enforcement agencies, including (among others) the Baton Rouge Police Department, the East Baton Rouge Sheriff's Office, the Louisiana State Police, and the Livingston Parish Sheriff's Office. These separate law enforcement agencies did not spontaneously arrive on the scene. What is currently known about the process by which

these agencies came together, and how they were organized, was pled in the Third Amended Complaint, and is discussed in the pages below.

Scores of protesters, including Plaintiffs, were arrested for violations of La. R.S. § 14:97, "simple obstruction of a highway of commerce," although, in Plaintiffs' cases, there was no probable cause for the charge. Instead, the arrests were made with pre-printed, boilerplate affidavits of probable cause, demonstrating that the arrests of protesters for this manufactured offense had been planned in advance. At least eighty-seven (87) of these pre-printed forms were used in arresting protesters – all claiming that the arrestee was in the roadway and was taken into custody only after ignoring several verbal orders to "exit the lanes of travel."[1]

The method used by the Defendants to make these warrantless arrests under false charges could not have been better designed to mask the identities of the officers involved. A large assembly of BRPD officers, Sheriff's deputies, and Louisiana State troopers would line up facing the protesters, in full militarized riot gear with helmets, masks, body armor, and long guns.[2] At some point, a subset of the group of officers, deputies and troopers would charge toward the protesters.[3] As each protester was grabbed by one or more law enforcement officers, the protester would be handcuffed or zip-tied and then walked by "Mobile Field Force officers" to the "prisoner processing area for the protest events" where the paperwork for the arrest would be filled in with

---

[1] Third Amended Complaint (TAC), ECF No. 56 at 42 ¶ 293 (Leroy and Deon Tennart); 45 ¶ 305 (Eddie Hughes); 57 ¶¶ 366–67 (Thomas Hutcherson).
[2] TAC at 40 ¶¶ 284–87 (Leroy and Deon Tennart); 43 ¶¶ 297–98 (Eddie and Godavari Hughes); 45–46 ¶¶ 310–11 (Christopher and Brachell Brown); 51 ¶ 338 (Elcide Harris).
[3] TAC at 40 ¶ 287

the name and other identifying information of each arrestee.[4] Thus, the arrest reports for the Plaintiffs name only the person(s) who processed their arrest but frequently do not name all of the people who physically seized and restrained them.[5]

Should law enforcement officers and their agencies escape liability for violations of citizens' constitutional rights solely because those culpable officers have colluded to preserve their anonymity? This is, at its base, the question posed by Sheriff Gautreaux and multiple East Baton Rouge Sheriff's deputies named as Defendants ("EBRSO Defendants");[6] AIX Group, insurer to Sheriff Gautreaux and EBRSO Deputies; and by Sheriff Jason Ard and multiple Livingston Parish Sheriff's deputies named as Defendants ("LPSO Defendants")[7] in their Motions to Dismiss.[8]

Defendants construct a convenient escape route in which arresting and supporting officers actively maintained their anonymity throughout the arrest process, then demand dismissal of claims challenging those arrests because Plaintiffs—without the benefit of discovery—have no means of identifying the particular officers who harmed them. But neither EBRSO Defendants nor LPSO Defendants are shielded from liability because they willfully participated in a process where, at every turn, individual actors were able to remain anonymous and unidentifiable while

---

[4] TAC at 49 ¶ 330.

[5] TAC at 41–42 ¶ 293 (Leroy and Deon Tennart); 44 ¶ 304 (Eddie Hughes); 49 ¶ 330 (Christopher Brown); 49–50 ¶¶ 332–33 (Brachell Brown); 54 ¶¶ 354–55 (Elcide Harris).

[6] The EBRSO Deputies are: Todd Martin; Jeffrey Sabella, Troy Banks, Kenneth Tiner, Robert Stone, Steve Young, Gregory Warren, Blair Nicholson, James Cooper, Willie Stewart, Evelena Banks, Shannon Broussard, Calvin Pruter, Eric David, Harry Howard, William Jenkins, Michael Allison, David Philpot, Anthony Smith, John DePedro, Dustin Sellars, Thomas Weimer, William Lawhun, Marshall Menou, Nicholas Schiro, Matthew Wolfe, James Broussard, Jason Ransome, Jared Wilson, James Jamison, Benjamin Friedman, Roderick Brown, Brandon McCall, Casey Lillie, Jesse Hale, Jeremy Heine, Gregory Dale Dicharry, Cline Breland, Larry James, Jason Jones, Robert Dixon, Todd Morris, Leroy Griffin, and Bryan White.

[7] LPSO Deputies are: Alden Thomasson, Denny Perkins, Donnie Robinson, Lance Landry, Brandon Ashford, Jason Harris, Chad McGovern, Calvin Bowden, Frank Rizzuto, Tom Martin, Travis Harris, Jonathan Crozier, Cory Winburn, Mia Terrell, Jeff Beatty, Jeremy McCullen, Tim Ard, Eric Rogers, Kyle Hotard, Carl Childers, David Everhart, Jacob Bourgeois, T.J. Morgan, Trey Roberts, Brandon Tullos, Dustin Brown, Dustin Covington, and Richard Hagan.

[8] ECF Nos. 117; 122

coordinating and actively participating in the response and engagement of other agencies in violating Plaintiffs' civil rights.

Similarly, Defendants participated in a largely opaque process of decision-making and coordination of the law enforcement response to the protests. Despite vigorous attempts to uncover the complete substance of the meetings and communications through which the response was planned and executed, Plaintiffs have only secured broad descriptions of this process. These descriptions, however, are more than enough to allege a plausible claim that from the command level down to the street, these Defendants participated in a conspiracy to arrest protesters without probable cause to silence their voices.

Notwithstanding the obstacles imposed by Defendants' deliberately secretive methods in breaking up the protests, Plaintiffs pleaded, in a detailed manner, the factual basis for the claims of the Third Amended Complaint, which survives review under Federal Rule of Civil Procedure 12(b)(6).

## II.    Standard of Review

### A.  The Deferential Standard of Review of the Complaint Under Rule 12(b)(6)

A motion under Rule 12(b)(6) is viewed with disfavor and rarely granted.[9]. When reviewing the complaint to determine its sufficiency, the court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff."[10]

---

[9] *See Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (quoting *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982))
[10] *See Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014).

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[11] "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[12] The standard of "facial plausibility" is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[13]

Finally, "[w]hen reviewing a motion to dismiss, a district court 'must consider the complaint in its entirety, as well as other sources ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' "[14]

### B. Rules 8 and 12 Do Not Require a More Exacting Review of Complaints Alleging Claims Against a Public Official.

Both EBRSO and LPSO Defendants have argued that a heightened pleading standard continues to apply in cases where Qualified Immunity has been asserted.[15] The cases cited by them either arose from a summary judgment ruling[16], or pre-date Supreme Court precedent expressly

---

[11] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[12] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).
[13] *Id.*
[14] *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).
[15] ECF Nos. 117-1 at 8; 122-1 at 21.
[16] *Fleming v. Tunica County, Miss.*, 2012 WL 4753381 (5th Cir. October 5, 2012).

holding to the contrary.[17]To the extent that the Fifth Circuit continues to endorse a heightened pleading standard where defendants assert qualified immunity, this practice runs afoul that precedent.[18]

### C. Considerations Applicable to 12(b)(6) Review of a §1983 Complaint Where the Plaintiff Cannot Identify Precisely Which Officer in a Known Group Committed Particular Actions That Violated Plaintiff's Civil Rights

The EBRSO and LPSO Defendants have cited various authorities for the general proposition that principles of notice pleading require individualized allegations of wrongdoing for each Defendant.[19] But more specific authority on the particular issue of injuries perpetrated by unidentified law enforcement officers provides an exception to this general rule.

In the Southern District of Texas, a plaintiff in a § 1983 excessive-use-of-force claim against seven police officers was unable to identify which of the officers had actually tased him.[20] As in this case, the defendant officers argued that the "'[p]laintiffs' approach of suing every officer who responded to the scene is insufficient to state viable claims against individual officers'" and sought to dismiss the claims on a 12(b)(6) motion.[21] The plaintiffs responded that "the reason that Plaintiffs cannot identify specifically who engaged in which acts is that Defendants have not yet provided investigation materials that would shed some light on these issues."[22]

---

[17] *See Jones v. Bock*, 549 U.S. 199, 224 (2010) ("We once again reiterate, however-as we did unanimously in *Leatherman*, *Swierkiewicz*, and *Hill*-that adopting different and more onerous pleading rules to deal with particular categories of cases should be done through established rulemaking procedures, and not on a case-by-case basis by the courts.") *Erickson v. Pardus*, 551 U.S. 89 (2007); *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993).

[18] *Id*.

[19] ECF.117-1 at 5-6, ECF No. 122-1 at 10-12.

[20] *Khansari v. City of Houston*, 14 F. Supp. 3d 842 (S.D. Tex. 2014).

[21] *Id.* at 860.

[22] *Id.*

The court denied the defendant officers' motion to dismiss, stating:

> [D]efendants' contention that the plaintiffs' allegations of fact are insufficient to survive their Rule 12(b)(6) motion to dismiss all of the officers . . . take the principle requiring plaintiffs to identify individual conduct attributable to each officer too far. At this early stage of a case, successful Rule 12(b)(6) motions based on plaintiffs' failure to plead their claims with factual specificity are typically directed at claims asserted against policymakers who are named as defendants absent any allegation about their specific role in formulating or implementing a challenged policy. . . . Here, however, the court is not dealing with allegations against policymakers. At issue are allegations that a number of individual officers had direct involvement in using or failing to prevent the use of excessive force against plaintiff Corey Khansari.
>
> . . . .
>
> While defendants correctly argue that the plaintiffs' allegations lack factual specificity needed to deny their assertions of qualified immunity, lack of such factual specificity at this stage of the case does not provide a basis on which to grant or deny defendants' motion to dismiss for failure to state a claim.[23]

In *Hinojosa v. Livingston*,[24] the Fifth Circuit applied this exception in a similar situation, but involving final policy-makers. Three high level officials of the Texas Department of Criminal Justice moved to dismiss the complaint on grounds of qualified immunity, arguing, as Sheriffs Gautreaux and Ard do here, that the complaint failed to allege with specificity how they were involved in any decisions regarding the decedent's housing or medical needs.[25] The district court deferred ruling on the qualified immunity defense and ordered discovery "limited to the personal

---

[23] *Khansari,* 14 F. Supp. 3d at 860–61, citing *Huff v. Refugio County Sheriff's Department,* 2013 WL 5574901, *2 (S.D. Tex. Oct. 9, 2013) (Costa, J.) The district court granted limited discovery on the issue of the individual officers' participation in the event. This relief is discussed more completely in Plaintiffs' opposition to the motions of EBRSO and LPSO to stay discovery, filed contemporaneously with this opposition.

[24] 807 F.3d 657 (5th Cir. 2015).

[25] *Id*. at 668.

knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death."[26]

The Fifth Circuit dismissed the defendants' interlocutory appeal, holding that the district court was correct in deferring its ruling on qualified immunity where "the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity" and "the court remains unable to rule on the immunity defense without further clarification of the facts."[27] Courts in other circuits have similarly refused to permit dismissal of a §1983 complaint at the Rule 12(b)(6) stage when confronted with this problem. [28]

This case presents similar facts to *Khansari*, and *Hinojosa*. Plaintiffs face a process in which law enforcement agencies have concealed the identities of those officers responsible for the violation of the rights. Plaintiffs attempted to identify the exact identities of the officers, deputies or troopers who effected the seizure of each of the Plaintiffs, beginning in some instances at the

---

[26] *Id*. at 663.

[27] *Id*. at 664.

[28] *See Saunders v. Duke*, 766 F.3d 1262, 1268 n.2 (11th Cir. 2014) (reversing grant of qualified immunity based on failure of pleading to identify which defendant actually struck plaintiff; plaintiff's allegation that an unidentified agent struck him and that defendant agents were all present at the time sufficient to defeat motion to dismiss); *Burley v. Gagacki*, 729 F.3d 610, 622 (6th Cir. 2013) (judgment as a matter of law reversed because "plaintiffs' inability to identify the officers who entered their home is the consequence of the agents' conduct—the officers wore black clothing and face masks, with the intent to conceal their identities, and refused to provide their names when asked"); *Dubner v. City and Cnty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) (reversing dismissal where plaintiff had attempted, without success, to identify the officers arresting her at a protest); *Rauen v. City of Miami*, No. 06-21182, 2007 WL 686609 at* 4 (S.D. Fla. March 2, 2007) ("Plaintiffs' inability to identify the specific officers involved in their alleged deprivation of rights does not mandate dismissal of any of the claims under Federal Rule 12(b)(6), particularly where Plaintiffs have named as Defendants only those entities and individuals who were present at the skirmish line where Plaintiffs were injured"); *see also Colbert v. City of Chicago*, 851 F.3d 649, 657-58 (7th Cir. 2017) (while affirming summary judgment, court of appeals notes that at the motion to dismiss stage, "[plaintiff's] theory of the case that the four named officers were responsible for the alleged damage may have been sufficient" and that even in response to summary judgment, plaintiff could have overcome his inability to pinpoint the personal responsibility of each officer by alleging "that the named officers participated in something akin to a 'conspiracy of silence among the officers' in which defendants refuse to disclose which of their number has injured the plaintiff").

time of Plaintiffs' unlawful arrests[29] and continuing through the filing of the Plaintiffs' Original Complaint.[30] Unfortunately, this information is held exclusively by the Defendants, including those who have moved to dismiss the Third Amended Complaint.

### III.    The Facts Pleaded in the Third Amended Complaint

EBRSO faults the Third Amended Complaint for taking a "shotgun" approach. But given the intricacies and scale of the law enforcement response to the July protests, the lengthy pleading describes the different groups of law enforcement officials and officers then alleges the role of each group in the concerted action to silence Black dissent against years of racially discriminatory policing that came to a head in the shooting of Alton Sterling on July 5, 2016. The facts set forth below are alleged in the Third Amended Complaint and are therefore accepted as true and construed in the light most favorable to the plaintiff.[31]

#### A.  The Protests

The killing of Alton Sterling on July 5, 2016, was captured on video, which showed Mr. Sterling being forcibly restrained on the ground and then shot.[32] By the evening of July 6, 2016, Baton Rouge residents, a vast majority of whom were Black, gathered for what became daily and

---

[29] *See, e.g.,* TAC at 47 ¶ 316: "While the [Brown] siblings were being booked, they saw that the nametags and badge numbers of the officers had been covered with opaque tape. BRACHELL asked questions of several officers, but was told to "Shut up." She asked the names of various officers, but the officers refused to respond."

[30] The Plaintiffs' attempts to establish the identities of, and determine the roles of, Defendants other than those who have moved for dismissal, are described in Plaintiff's Memorandum in Support of Motion for Pre-Rule 26(f) Discovery (ECF No. 4-1) and the Court's Order granting the motion in part (ECF No. 30). These efforts included two civil actions for mandamus against the Baton Rouge Police Department and Louisiana State Police as well as public records requests to the East Baton Rouge Sheriff's Office and Livingston Parish Sheriff's Office.

[31] *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014).

[32] TAC at 36 ¶ 269.

nightly vigils and peaceful protests at various locations throughout the city.[33] Between July 6 and 10, 2016, thousands of people protested throughout Baton Rouge. Many, including some Plaintiffs, protested on a sizeable grassy lot adjacent to the intersection of Airline Highway and Goodwood Boulevard in Baton Rouge, across the street from the headquarters of the BRPD.[34] Some of the protesters' chants and signs were specific to Mr. Sterling; others decried the history and pattern of brutal and racialized policing in Baton Rouge, of which Mr. Sterling's killing was the latest, particularly egregious example.[35]

### B. Designing and Coordinating the Conspiracy: Defendants Holden, Dabadie, Edmonson, Gautreaux, Ard, Hurst and Cazes

Plaintiffs specifically alleged that in response to the protests and the national spotlight on the protesters' claims of racially discriminatory policing in Baton Rouge, leadership of several law enforcement organizations developed and implemented a strategy, motivated by racial animus, to silence their voices.[36] The coordinators of the response, according to the Third Amended Complaint, were Defendants Holden, Dabadie, Edmonson, Gautreaux, Ard, Hurst and Cazes.[37] Their coordination was facilitated by the Governor's Office of Homeland Security and Emergency Preparedness ("GOHSEP"), the Mayor's Office of Homeland Security and Emergency Preparedness ("MOHSEP"), and the Louisiana Sheriffs' Association ("LSA").[38]

---

[33] *Id*. at 36 ¶ 270.
[34] *Id*. at 36 ¶ 271.
[35] *Id*.
[36] *Id.* at 37 ¶ 273.
[37] *Id.*
[38] *Id*. at 37 ¶ 274.

The Third Amended Complaint specifically alleges that Defendant Gautreaux, together with Defendants Holden, Dabadie, Edmonson, Cazes, Hurst, or their agents, as well as others, "**gathered at GOHSEP on several occasions between July 6 and 10, 2016, in order to formulate and implement their agreement to suppress the protests**."[39] Further, Mayor-President Holden implemented the City/Parish's Emergency Operations Plan ("EOP") through MOHSEP. Under the terms of the EOP and BRPD and EBRSO's internal policies, Sheriff Gautreaux, together with Mayor-President Holden and Police Chief Dabadie, coordinate law enforcement response to "civil disturbances."[40]

In joining forces with the Mayor-President, the Chief of Police, and the City of Baton Rouge, Sheriff Gautreaux was well aware of Defendants' lengthy history of racially discriminatory policing detailed in the Third Amended Complaint. Sheriff Gautreaux could not have been—and was not—ignorant of these customs and practices. And as each day of the protests ended, the Sheriff had confirmation that these customs and practices were being implemented in the actions of the combined forces he helped to coordinate.

### C.  The Goals and Tactics Agreed to by the Conspirators

The EBRSO and LPSP defendants claim that there are no allegations in the Third Amended Complaint about the agreement that forms the basis of the conspiracy. That is incorrect. The elements of the coordinated plan developed by Mayor-President Holden, Sheriff Gautreaux, Chief Dabadie, and others in their meetings at GOHSEP and MOHSEP during July 6–10 are alleged to be the following:

---

[39] *Id*. at 37 ¶ 275 (emphasis added).
[40] *Id.* at 37–38 ¶ 276.

(a) create an intimidating law enforcement response that was militarized, in furtherance of which police personnel wore and used riot gear and carried rifles, shields, and/or batons while confronting the protesters;

(b) effectuate the maximum number of arrests of innocent protesters, so as to send a message to Black citizens and residents of Baton Rouge that dissent would not be tolerated;

(c) target certain protesters for arrest, based on these protesters' supposed group affiliations (in particular, affiliation with Black political and social organizations) and/or Defendants' belief that they were "leaders" of the spontaneous protests;

(d) book protesters *en masse* on false criminal charges and to maximize the time those arrested spent in custody as punishment for defying law enforcement;

(e) ensure officers used excessive physical force to effectuate these illegal arrests;

(f) insulate individual officers from accountability, criticism or consequence for their role in Defendants' scheme by encouraging and/or allowing officers to cover the names and badge numbers on their uniforms with opaque tape and to refuse to give their names or badge numbers when asked directly by civilians; and

(g) discourage individuals from protesting in the future through a display of militarized police violence and intimidation.[41]

Further, the Third Amended Complaint alleges that the combined law enforcement entities and their officers, deputies and/or troopers responding to the protests adopted the following practices, customs and usages of BRPD and EBRSO:

A.    racially discriminatory policing, including the targeting of Black citizens with excessive force and unconstitutional arrest and disparate treatment of citizens based on race in matters other than arrest;

B.    the criminalizing and shaming of individuals who criticize law enforcement;

C.    the control, frustration, and termination of organized protest and dissent through the targeting for arrest, detention, abuse, and denigration of perceived protest "leaders" and, in particular, individuals who criticize the police;

D.    failing to create and implement clear, understandable policies for the benefit of sworn police personnel regarding how to respond constitutionally to mass demonstrations and spontaneous protest;

---

[41] TAC at 38 ¶ 280.

E.      failing to create and implement clear, understandable policies for the benefit of sworn police personnel regarding the importance of protecting and respecting the exercise of First Amendment rights through assembly and protest;

F.      failing to train sworn personnel on the importance of protecting and respecting the exercise of First Amendment rights through assembly and protest;

G.      failing to supervise personnel to ensure that personnel execute their duties in a constitutional manner and without violating the rights of protesting individuals under the U.S. Constitution, the Constitution of Louisiana, and statutory law;

H.      failing to sufficiently distinguish in written policies regarding "Special Events" and "Civil Disorder" between unlawful "civil disorder" or "riot," on the one hand, and the exercise of the constitutionally protected right of free speech, regardless of compliance with burdensome permitting processes, on the other hand;

I.      the use of riot gear—i.e., military armaments—such as shields, helmets with facemasks, body armor, batons, rifles, and military vehicles without just cause and in order to frighten and intimidate those who wish to peacefully assemble to voice their concerns on issues of public importance, thereby creating an atmosphere of tension;

J.      failing to discipline sworn personnel who use excessive force, engage in racist policing, prepare false reports, falsely arrest citizens, and/or violate First Amendment rights, thereby creating a culture of impunity in which officers who commit such misconduct learn that they will suffer no adverse consequences;

K.      tacitly approving and supporting a police code of silence, whereby officers are expected to protect and shield other officers who are accused of misconduct, such as excessive force, racist policing, preparation of false reports, false arrest of citizens, and/or violations of First and Fourth Amendment rights and other constitutional and statutory rights;

L.      allowing a widespread practice of excessive force, directed particularly at Black citizens and residents, to continue unabated, despite notice of the pattern and the full knowledge of policymakers;

M.      failing to create and implement policies and failing to train sworn personnel regarding how to identify the crime of Simple Obstruction of a Highway of Commerce and apply the statute in a manner that respects the First Amendment rights of Black citizens and residents of Baton Rouge;

N.      failing to create and implement a "street closure" permitting process to enable those who wish to engage in demonstrations on matters of immediate public importance to obtain a permit on an emergency basis (i.e., with waiver of the 45 day notice requirement);

O.    imposing onerous financial conditions on those who seek to engage in protest— e.g., requiring proof of $1 million in liability insurance coverage and a receipt for rental of barricades.[42]

Contrary to the arguments made by EBRSO and LPSO defendants, then, the Third Amended Complaint alleges the specific goals and tactics agreed to and employed by the Defendants during July 6–10, 2016.

### D.  Conspiring Leadership of Assisting Agencies, Including Sheriff Ard

In addition to providing leadership to EBRSO, Sheriff Gautreaux was the president of the LSA during the protests. In conjunction with Defendants Cazes and Hurst, Gautreaux arranged for the presence of approximately 200 additional deputies from other sheriffs' offices to supplement local law enforcement's response to the protests.[43] Sheriff Ard of Livingston Parish was one of the LSA members supplying deputies to the coordinated law enforcement group. By committing his officers to assist in the response, Sheriff Ard ratified the customs, usages and policies of the other Defendants for use by the LPSO officers.[44]

### E.  Implementing the Plan: Five Categories of Conspiring Officers

The Third Amended Complaint alleges that between July 6 and 10, 2016, Baton Rouge area law enforcement officers and their agents, including BRPD, EBRSO, LSP, and sheriffs of surrounding parishes, put this plan into action. In furtherance of the above objectives, Defendants unlawfully arrested approximately 200 protesters as they engaged in peaceful protest protected by the First Amendment. Plaintiffs were among those arrested.[45]

---

[42] TAC at 57–60 ¶ 373.
[43] TAC at 38 ¶ 277.
[44] *Id*. at 38 ¶ 278.
[45] *Id.* at 39 ¶ 281.

The law enforcement officers involved in the execution of the plan, including the EBRSO and LPSO deputies, fall into five categories. First, some officers were responsible for coordinating the activities of other officers in the field. The EBRSO Defendants allegedly performing these duties are: Todd Martin, the SWAT Commander for EBRSO, who assisted in coordinating EBRSO's response to the protests at Airline Highway during some of the arrests;[46] Gregory Dale Dicharry, an EBRSO Captain who was on duty at the Emergency Operations Center, where he took part in coordinating EBRSO's response during the protests at Airline Boulevard when Plaintiffs were arrested;[47] Todd Morris, an EBRSO Captain who was on duty on July 9 and 10 at the Command Post at BRPD Headquarters, where he assisted in the coordination of EBRSO's response to the protests during the days that Plaintiffs were arrested;[48] Leroy Griffin, an EBRSO Captain who assisted in coordinating EBRSO's response to the protests on July 9, when some Plaintiffs were arrested;[49] and Bryan White, a Major with EBRSO who assisted in coordinating EBRSO's response to the protests at the time Plaintiffs were arrested.[50]

Second, during the time immediately preceding and through the arrests of the Plaintiffs, a Mobile Field Force (MFF), formed of scores of law enforcement officers from multiple agencies, including EBRSO and LPSO, assembled, marched together in full militarized riot gear with helmets and long guns to the protest sites and faced the protesters.[51]

---

[46] *Id.* at 16 ¶ 109.
[47] *Id.* at 19 ¶ 147.
[48] *Id.* at 20 ¶ 153.
[49] *Id.* at 20 ¶ 154.
[50] *Id.* at 20 ¶ 155.
[51] *Id.* at 40 ¶¶ 284–87 (Leroy and Deon Tennart); 43 ¶¶ 297–98 (Eddie and Godavari Hughes); 45 ¶ 310–11 (Christopher and Brachell Brown); 51 ¶ 338 (Elcide Harris)

At different points during the weekend, a third category of officers, subsets of the mobile field force group, would charge toward the protesters, seize them, and restrain them with zip-ties.[52]

The arrested protesters would be taken to the "prisoner processing area for the protest events," staffed by law enforcement officers who form a fourth category: Officers who had not been present at the immediate scene of the protests but would fill in portions of pre-printed paperwork for the arrests.[53] The protester would ultimately be taken to the East Baton Rouge Parish Prison, where she would be in the custody of Sheriff Gautreaux and EBRSO deputies.

All five of these categories of officers – the officers responsible for coordinating the activities of their subordinates, the MFF members, the subset of MFF officers seizing protesters, the officers working at the processing stations, and the EBRSO jailers -- provided essential support and assistance to the implementation of the plan devised by their superiors.

The Third Amended Complaint alleges that 40 of the Defendants are EBRSO law enforcement officers,[54] and 28 are LPSO law enforcement officers[55], each of whom were on duty and physically present during Plaintiffs' arrests. For the reasons stated above, Plaintiffs do not currently know which of these Defendants were in the MFF that marched forward to confront the protesters, which of them were in the subset of the MFF which charged forward and seized Plaintiffs, and which were performing support services at the processing stations.

---

[52] *Id*. at 41 ¶ 287
[53] *Id*. at 49–50 ¶ 330.
[54] TAC at 16–20 ¶¶ 109–55.
[55] *Id*. at 24–26 ¶¶ 209–36.

### F.  Arrests of the Plaintiffs

But as the Third Amended Complaint also makes clear, all five categories of Defendants participated in the violation of the Plaintiffs' rights. This includes:

Defendants who coordinated the officers in the field[56];

Defendants who lined up in the Mobile Field Force confronting the protesters[57];

---

[56] TAC at 16 ¶ 109; 19 ¶ 147; 20 ¶ 153-55.

[57] TAC at 40 ¶¶284 (Leroy and Deon Tennart) ("At the protest location, members of the BRPD, LSP, EBRSO, currently unknown Officer DOES, Deputy ROES, and Trooper MOES, and, on information and belief, members of the Ascension Parish Sheriff's Office and Livingston Parish Sheriff's Office stood in the street, blocking traffic on Airline Highway. Some officers used and wore "riot gear," including body armor, shields, masks, and batons. Some officers carried rifles. Protesters stood in the grassy lot adjacent to Airline Highway and Goodwood Boulevard, chanting and holding signs"); 43 ¶¶297-98 (Eddie and Godavari Hughes); 46 ¶310-11 (Christopher and Brachell Brown); 51 ¶338 (Elcide Harris) ("Some or all of Defendants listed in Paragraphs 33-236 above, including the currently unknown Officer DOES, Deputy ROES and Trooper MOES, lined up in the road, wearing riot gear, some of them carrying rifles. These Defendants, without cause, and in furtherance of the conspiracy to silence the protest of Black citizens and residents, ordered the protesters to disperse"); 52-53 ¶347 (Zachary Hill) ("Mr. HILL and his fellow protesters were confronted with a line of law enforcement including some or all of Defendants listed in Paragraphs 33-236 (including the currently unknown Officer DOEs, Deputy ROEs and Trooper MOEs) Most of them dressed in riot gear and carrying shields and batons. Some carried rifles"); 55 ¶359 (Thomas Hutcherson) ("At around 7 p.m., some or all of Defendants listed in Paragraphs 33-236 above (including the currently unknown Officer DOEs, Deputy ROEs and Trooper MOEs), began marching down Goodwood").

Defendants who, as members of the MFF, advanced towards the protesters and seized the Plaintiffs without probable cause[58], in some cases causing injury through the use of excessive force[59];

---

[58] TAC at 40 ¶287 (Leroy and Deon Tennart) ("Defendant officer DOES, ROES, and MOES then marched toward the protesters on the neutral ground and began yelling, "Move!" Defendant DOES, ROES, and MOES began pushing protesters into the street with their batons"); 43 ¶298 (Eddie and Godavari Hughes) ("As the protesters approached Old Hammond Highway, a group of law enforcement officers in riot gear, including some or all of Defendants listed in Paragraphs 33-233, including the currently unknown Officer DOES, Deputy ROES and Trooper MOES, blocked their path and began marching toward the protesters, eventually crossing the curb and advancing toward the protesters on the grass"); 45 ¶311(Brachell and Christopher Brown) ("Multiple unknown officers, including some or all of Defendants listed in Paragraphs 33-236 (including the currently unknown Officer DOES, Deputy ROES and Trooper MOES) , rushed the siblings from behind. As two officers grabbed BRACHELL from behind, CHRISTOPHER wrapped Brachell in his arms. The officers tackled Brachell and Christopher to the ground while other officers brandished firearms"); 53 ¶349 (Zachary Hill) ("At or around 4 p.m., law enforcement officers began arresting protesters, targeting those who appeared to be leaders of the protest")
[59] TAC at 41 ¶288 ("LEROY TENNART was pushed entirely off the neutral ground and into the street. As soon as his foot made contact with the cement of the highway he was slammed to the ground and tackled by approximately eight or nine defendant officer DOES, ROES, and/or MOES"); ¶289 ("DEON TENNART was standing on the sidewalk, not on the roadway, near a grassy lot across from BRPD headquarters in the company of his mother when he was struck in the face with a shield by an unknown officer and then tackled to the ground by that officer and other officers. He was handcuffed and forced across the street to the BRPD headquarters and suffered injuries as a result"); 45-46 at ¶311 ("One officer shot CHRISTOPHER [BROWN] with a Taser, delivering three separate electrical shocks while other officers watched. Multiple officers then converged upon BRACHELL and CHRISTOPHER, pinning them to the ground. An officer pushed his knee into BRACHELL's back, and officers then bound both siblings' wrists with plastic zip ties"); 46 at ¶312 ("While she was pinned to the ground, BRACHELL held her head up to avoid her face being smashed into the concrete, but still suffered a broken blood vessel in her left eye as a result of the attack. In addition to the injuries from the Taser, CHRISTOPHER suffered abrasions on his legs as officers lifted him up from the ground"); Id. at 314 ("Officers ripped the barbed Taser leads from CHRISTOPHER's side instead of allowing medical personnel to remove them. This caused physical pain and profuse bleeding that compounded the pain CHRISTOPHER had already experienced as a result of the original Tasing. CHRISTOPHER also experienced pain and numbness in his left arm, which persisted for the following four months"); 51 at ¶339 ("Since he was parked on the opposite side of the street, behind the line of police officers, Mr. HARRIS approached an unknown BRPD officer and asked how he should get to his car. The officer told Mr. HARRIS to cross the street. As Mr. HARRIS stepped into the street, some of the currently unknown Officer DOES, Deputy ROES and Trooper MOES converged upon him and seized him. An unknown BRPD officer frisked Mr. HARRIS and squeezed Mr. HARRIS's genitals while doing so"); 53 ¶¶349-50 ("Defendant THORNTON and three of the DOES, ROES and/or MOES, without provocation, tackled [ZACHARY] Mr. HILL to the ground and handcuffed him. Officers THORNTON, DOE, ROE, and MOE arrested Mr. HILL with excessive force, causing Mr. HILL to suffer a contusion on his foot, bruised knuckles, and a scratch to his head. While Mr. HILL awaited transport to East Baton Rouge Parish Prison, three unknown EBRSO deputies required all arrestees suspected of being members of the New Black Panther Party to participate in a "cheek swab." The deputies disregarded Mr. HILL's statement that he was not affiliated with this organization and forced him to provide a cheek swab"); 55 ¶¶360-62 ("[THOMAS] HUTCHERSON was instructed by some of the Officer DOES, Deputy ROES and/or Trooper MOES to move across the roadway to the gas station on the other side of Goodwood Blvd. Mr. HUTCHERSON attempted to comply with this instruction. As he was doing so, some of the Officer DOES, Deputy ROES and/or Trooper MOES in riot gear grabbed Mr. HUTCHERSON by the back of his shirt

Defendants who processed the Plaintiffs' arrests[60]; and

Defendants who, as jailors, mistreated some of the Plaintiffs. [61]

---

collar and yanked him backward, violently charged Mr. HUTCHERSON, contacted him with a riot baton, pushed Mr. HUTCHERSON, and caused him to fall and hit the back of his head on the pavement. Some of the Officer DOEs, Deputy ROEs and/or Trooper MOEs then converged on Mr. HUTCHERSON, flipping him onto his stomach and cuffing his wrists").

[60] TAC at 41-42 ¶¶293-94 (Leroy and Deon Tennart); 44 ¶¶304-05 (Eddie and Godavari Hughes); 49-50 ¶330-33 (Brachell and Christopher Brown);.52 ¶¶342-43 (Elcide Harris); 53-54 ¶353-55 (Zachary Hill), see especially 54 ¶355 ("The officer who authored Mr. HILL's arrest report, Defendant MARCUS THOMPSON, did not arrest Mr. Hill and had no knowledge of the circumstances leading to his detention. THOMPSON had been assigned to the "prisoner processing area" and wrote of Mr. Hill's arrest: "The Mobile Field Force officers brought the listed arrestee's [sic] B/M Harold Maze and B/M Zachary Hill to the processing table and turned the individual over to the processing team"); 56 ¶¶365-67 (Thomas Hutcherson).

[61] TAC at 41 ¶291 ("DEON TENNART and LEROY TENNART were transported from the BRPD headquarters to the East Baton Rouge Parish Prison where they were confined for nearly 40 hours in uncomfortable, unsanitary conditions, and without proper bedding. During the intake process, LEROY TENNART informed EBRSO personnel that he suffers from chronic hypertension. He was denied proper medication throughout his confinement"); 47 ¶319-20 ("After he was booked into EBRPP, CHRISTOPHER {BROWN} received no medical attention for his Taser wounds despite his requests for such assistance and his explicitly pointing out the profuse blood that visibly stained the yellow jersey he was wearing"); 47-48 at ¶320, 324 ("CHRISTOPHER [BROWN] was placed in a holding cell with dozens of other protesters who all struggled to fit into the cramped space of the cell in which they were held for hours. A deputy indiscriminately deployed a burst of pepper spray into the cell. CHRISTOPHER and the other detainees were left in this cell for several hours, coughing and crying in reaction to the spray . . . Once CHRISTOPHER was being processed for release from the jail, he was placed in another holding cell. For no clear reason, guards pepper sprayed CHRISTOPHER and the other prisoners in that cell twice before CHRISTOPHER was ultimately released"); 47 at ¶321 ("BRACHELL was placed into a smaller holding cell with more than twenty other women. Women in the sell began to sing a gospel song, and shortly thereafter, BRACHELL noticed that women in the cell had started to cough. Soon, everyone in the cell was coughing. At that point, BRACHELL noticed that an officer was pepper spraying the men in the nearby holding cell where CHRISTOPHER was. The women quieted their singing out of fear that they would be pepper sprayed next"); 51 at ¶341 ("ELCIDE HARRIS was transported from the BRPD headquarters to the East Baton Rouge Parish Prison where he was confined for approximately 22 hours in uncomfortable, unsanitary conditions, and without proper bedding. Mr. HARRIS informed medical staff of his medical conditions and the names of his required medications. He received none of these medications during his confinement"); 53 ¶352 ("[ZACHARY] HILL was placed in a holding cell in the 19th Judicial District Court and detained there for two to three hours before being moved to the East Baton Rouge Parish Prison where he was confined for close to 24 hours in uncomfortable, unsanitary conditions, and without proper bedding. Mr. HILL informed the nurse during intake at the Parish Prison that he was epileptic and required medication three times per day to avoid seizures. He was never provided with his necessary medications"); 55-56 ¶364 ("[THOMAS] HUTCHERSON was transported from BRPD headquarters to the East Baton Rouge Parish Prison where he was detained for approximately 24 hours in uncomfortable, unsanitary conditions and without proper bedding. Mr. HUTCHERSON has a history of heart problems, stroke, high blood pressure, and high cholesterol. He takes multiple medications on a daily basis to manage these conditions. Mr. HUTCHERSON informed Sheriff's personnel at the Parish Prison of his medical conditions, the medications he was taking, and the fact that he had hit the back of his head after being tackled by the arresting officers. Mr. HUTCHERSON was provided none of his necessary medications, nor was he provided with medical assistance despite informing several Deputy ROEs and other EBRSO personnel that he believed he might be suffering from a concussion as a result of his violent arrest").

As the lengthy footnotes to the above text amply demonstrate, the notion that the Third Amended Complaint did not specifically allege the unconstitutional and tortious actions of the Defendants is specious.

IV.  –The Third Amended Complaint States Plausible Claims for Relief against the EBRSO and LPSO Defendants

The EBRSO Defendants and LPSO Defendants seek dismissal on grounds that the Plaintiffs have not sufficiently pleaded violations of their rights. They argue that insufficient facts have been alleged against them in their individual and official capacities. They also raise the defense of qualified immunity, relying mainly on their arguments as to sufficiency for the proposition that Plaintiffs did not suffer a violation of their rights.

A. Sufficiency of allegations against EBRSO and LPSO Deputies in their individual capacities.

EBRSO and LPSO deputies state that they cannot be held liable for the claims brought against them by Plaintiffs in paragraphs 384–477 of the Third Amended Complaint because Plaintiffs have not alleged the specific, individual acts of each of the named Defendants that violated Plaintiffs' rights.

As discussed above, when faced with similar facts where plaintiffs could not identify the specific defendants who took specific actions in the violation of plaintiffs' rights, and where the information plaintiffs needed to plead the defendants' individual actions with more specificity were exclusively in defendants' possession, the Fifth Circuit and other federal courts affirmed the

practice of limited discovery specifically targeted at identifying the specific defendants who took the actions complained of in plaintiffs' complaints.[62]

### B.  Claims against Sheriffs Ard and Gautreaux in their individual capacities

Plaintiffs alleged that Sheriffs Ard and Gautreaux conspired with Defendants Holden, Dabadie, and Edmonson to suppress the protests of July 8–10, 2016. Therefore, although neither Sheriff may have actually participated in Plaintiffs' arrests, they may be held liable for the resulting constitutional violations committed by a coconspirator or his agent. As the Fifth Circuit has explained, "[t]he contention that a conspiracy existed which deprived the petitioner of rights guaranteed by federal law makes each member of the conspiracy potentially liable for the effects of that deprivation."[63] The Fifth Circuit has specifically noted that "[l]iability does not arise solely because of the individual's own conduct. Some personal conduct may serve as evidence of membership in the conspiracy, but the individual's actions do not always serve as the exclusive basis for liability."[64]

### C.  Official Capacity Claims and *Monell* liability for the Sheriffs' offices

The office of Sheriff in Louisiana is an autonomous political subdivision under the Louisiana Constitution and is thus treated as a municipality for purposes of liability under *Monell v. Dep't of Social Servs*.[65]   EBRSO Defendants concede that Sheriff Gautreaux is a final

---

[62] *See* Section II.C *supra*.
[63] *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 137 (5th Cir. 1990) (quoting *Slavin v. Curry*, 574 F.2d 1256, 1263 (5th Cir. 1978)).
[64] *Id*.
[65]  436 U.S. 658 (1978)

policymaker but argue that Plaintiffs' allegations as to the existence of a policy, custom, or failure to train/supervise are insufficient.[66] Similarly, LPSO Defendants concede that Sheriff Ard is a final policymaker but argue that Plaintiffs have not identified an official policy issued by Sheriff Ard or custom of his office that was the moving force behind Plaintiff's injuries.[67] In addition, the EBRSO Deputies argue that they are not final policymakers and cannot therefore be sued in their official capacities.[68]

Contrary to these arguments, Plaintiffs have specifically alleged multiple bases for official capacity liability against Sheriffs Gautreaux and Ard.

### 1. Decisions of Sheriffs Gautreaux and Ard as final policy-makers

*Monell* liability exists where a plaintiff proves the existence of: an unconstitutional official policy, a custom or practice, or deliberate indifference to the known or obvious consequences that constitutional violations will result from a facially innocuous policy.[69]

*Monell* liability can arise from a single decision or act of the final policymaker.[70] Thus, a single unconstitutional act or decision by a local governmental entity's final policymaker can subject that governmental entity to liability under Section 1983 if that act or decision is within the sphere of the final policymaker's authority, and the policymaker's action reflects an intentional, deliberate decision.[71]

---

[66] ECF No. 117-1 at 15–22.
[67] ECF No. 122-1 at 23.
[68] *Id.*
[69] *Piotrowski v. City of Houston*, 237 F.3d 567, 578-79 (5th Cir. 2001) (internal quotations omitted).
[70] *Gelin v. Housing Auth. of New Orleans*, 456 F.3d 525, 527 (5th Cir. 2006).
[71] *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996); *Jackson v. Bexar County*, No. 15-509, 2016 WL 8802259 (W.D. Tex. Apr. 5, 2016).

Here, Sheriff Gautreaux was heavily involved in the creation and implementation of the Defendants' coordinated plan to silence Black dissent and used his position of authority to effectuate that plan, including adoption of BRPD's practices, customs, and usages of racially discriminatory policing and EBRSO's own practices, customs, and usages of excessive force in arrests and housing detainees in unconstitutional conditions. Sheriff Ard, in his capacity as final policymaker for Livingston Parish, willingly made the decision to send his deputies to participate in the coordinated plan to silence Black dissent through the coordination of Sheriff Gautreaux, the LSA Defendants, and other Defendants through the use of excessive force and unlawful arrest. He also failed to recall those deputies, despite their participation in mass illegal arrests and other unconstitutional conduct, until after the protests ended.

### 2.  **Failure to train**

Plaintiffs may also make out a claim for *Monell* liability based on a theory of failure to supervise or train. The elements of a failure to supervise or train subordinates are: (1) inadequate supervision or training procedures, (2) deliberate indifference in supervision or in adopting the inadequate training policy, and (3) the failure in supervision or inadequate training policy directly caused the violations in question.[72]

Plaintiffs allege that EBRSO Defendants failed to train officers on the importance of protecting and respecting the exercise of the First Amendment rights through assembly and protest; failed to supervise personnel to ensure that duties were executed in a constitutional manner and

---

[72] *See Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010); *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998).

without violating the rights of protesting individuals, and failing to train officers regarding how to identify the crime of simple obstruction of a highway and apply that statute in a without violating First Amendment rights.[73]

### 3. __Ratification__

While a decision by a subordinate official can comprise a custom or usage of which a final policymaker knew or should have known, a final policymaker may also delegate his final policymaking authority to a subordinate. A "policy" can also arise from a final policymaker's ratification, or approval, of a subordinate's decision or action as well as the basis for the decision.[74]

The standard for a claim based on a theory of ratification is well established in the Fifth Circuit: To determine whether the plaintiff has satisfied her burden, the court examines after-event conduct by the final policymaker to determine whether the final policy-maker's conduct "approv[ed] reckless police behavior."[75] However, the Fifth Circuit has repeatedly ruled that the mere defense by a final policymaker of his subordinates' conduct after the event does not establish a policy approving reckless police behavior.[76]

The seminal case in this circuit for this theory of ratification is *Grandstaff v. City of Borger, Tex.*[77] In *Grandstaff*, six officers, comprising the "entire night shift of the [police] force" participated in the gunning down of a man they mistook for a fugitive.[78] Following the killing of

---

[73] TAC at 58–59 ¶ 373(F), (G), (M)

[74] *Culbertson v. Lykos*, 790 F.3d 608, 621–22 (5th Cir. 2015).

[75] *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986). *See also Snyder v. Trepagnier*, 142 F.3d 791, 797-798 (5th Cir. 1998); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009).

[76] *Coon*, 780 F.2d at 1162; *Peterson*, 588 F.3d at 848.

[77] 767 F.2d 161 (5th Cir. 1985); *see also Harris v. City of Bastrop*, 2016 WL 3648107, at *9 (W.D. La. 2016).

[78] 767 F.2d at 165.

the innocent man, "there were no reprimands, no discharges, and no admissions of error."[79] The Fifth Circuit affirmed that "[i]f there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights."[80]

Since *Grandstaff*, the Fifth Circuit has often narrowed that case's holding to its "extraordinary facts," concluding that "its analysis can be applied only to equally extreme factual situations."[81] The Fifth Circuit has also noted that *Grandstaff* "does *not* stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy."[82]

In the case at bar, assuming, for the sake of argument, that Plaintiffs have not met their burden of sufficiently pleading that Defendants Gautreaux and Ard directly participated in the planning and coordination of the unconstitutional law enforcement response to the protests, Plaintiffs allege "extraordinary facts" that meet the challenge laid out by *Grandstaff*. This is not a case in which Plaintiffs' rights were violated by a handful of officers in a brief encounter which, after the fact, the final policymaker declined to condemn. Just as the entire night shift participated in the incident underlying *Grandstaff*, here, Plaintiffs complain that scores of deputies employed

---

[79] *Id*. at 171.
[80] *Id*. at 170 (citing *Languirand v. Hayden*, 717 F.2d 220 (5th Cir. 1983)).
[81] *Snyder*, 142 F.3d at 797–98; *see also Peterson*, 588 F.3d at 848; *Coon*, 780 F.2d at 1161.
[82] *Id*.

by Sheriff Gautreaux and Sheriff Ard carried out a series of unconstitutional actions over a period of days.

It is significant that the Third Amended Complaint alleges that the leadership of the participating law enforcement agencies "gathered at GOHSEP on several occasions between July 6 and 10, 2016, in order to formulate and implement their agreement to suppress the protests."[83] Thus, Plaintiffs do not allege simply that Defendants Gautreaux and Ard failed to reprimand or discharge officers following these events, or otherwise failed to admit the errors of their subordinates. Instead, day after day, hour after hour, these defendants continued to assign their subordinates to participate in the combined law enforcement forces confronting the protesters, as the Sheriffs were being informed of (or in some cases, personally saw on live television) facts that showed that the combined law enforcement forces, including their subordinates, were suppressing constitutionally protected dissent by means of arrests on false charges, use of excessive force, and the other unconstitutional tactics detailed in the Third Amended Complaint. The active deployment of such a significant percentage of their employees even as the wholesale violation of protesters' rights was on clear display to the public and attendees of law enforcement meetings at MOHSEP and GOHSEP, without taking steps to withdraw their subordinates or take action to prevent the continuing violation of protesters rights is a plausible basis for a failure-to-supervise claim or, in the alternative, a ratification of their subordinates' misdeeds.

---

[83] ECF No. 56 (TAC) at 37 ¶275.

### D. Defendants are not entitled to qualified immunity for their violations of Plaintiffs' Constitutional rights

EBRSO and LPSO Defendants have argued that qualified immunity shields them from liability in their individual capacities. Both groups have relied in part on the argument that the Plaintiffs' inability to say exactly which deputies physically seized them or otherwise participated in their arrests is a failure of the first prong of qualified-immunity analysis: the violation of a protected right. As Plaintiffs have already addressed this "personal responsibility" argument in Sections II.C and III supra, they proceed to address the remaining qualified immunity analysis for each claim.

Qualified, or "good faith," immunity is an affirmative defense available to most state officials.[84] Under § 1983 a defendant will not be insulated from liability if he violated "clearly established statutory or constitutional rights of which a reasonable person would have known."[85] "Clearly established" constitutional or statutory rights need not be established by factually similar jurisprudence, but the circumstances must be such that a reasonable official would conclude that what he is doing violates the law.[86] The Fifth Circuit identifies "clearly established" rights by looking to either a "controlling authority—or a 'robust consensus of persuasive authority'" that defines the right in question.[87] Whether an official's conduct is reasonable is an objective question in which the conduct is "measured by reference to clearly established law."[88]  Analysis of a qualified immunity defense encompasses two inquiries: (1) whether the plaintiff has alleged facts

---

[84] *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).
[85] *Harlow*, 457 U.S. at 818.
[86] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[87] *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011).
[88] *Id*.

that comprise violation of constitutional right; and (2) whether the right was clearly established at the time of the injury.[89]

The starting place for considering whether Defendants' conduct violated "clearly established Federal law" is *Cox v. Louisiana*[90], one of the leading cases on the unconstitutionality of arresting protestors without probable cause in order to silence them. *Cox* should be well known to these Defendants, as it arises from Baton Rouge and specifically involves the treatment of Black protestors by the local government's police force and sheriff's office.

The Baton Rouge police and sheriff's departments participated in the arrest and prosecution of Reverend Cox, who led a group of 1,500-2000 mostly Black students in protesting segregation, discrimination, and the arrest of some of their peers.[91] High-ranking representatives of the police department and sheriff's office encouraged Reverend Cox to disband the protest.[92] When he declined, these officials reported by radio to the Sheriff and Chief of Police, who were not on the scene but were nearby.[93] Protesters marched and then gathered outside of the courthouse.[94]

After the Reverend gave a speech, in which he both affirmed the protest's nonviolent nature and encouraged the protestors to conduct sit-ins at Baton Rouge lunch counters, the Sheriff concluded the protest had begun to violate the law and instructed the crowd to disperse.[95] Sheriff's deputies began touching and possibly shoving members of the crowd and law enforcement officers

---

[89] *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722 (5th Cir. 2018).
[90] 379 U.S. 536 (1965).
[91] *Id*. at 539.
[92] *Id*. at 540.
[93] *Id*.
[94] *Id*. at 546.
[95] *Id*. at 542-43.

exploded tear gas shells at the crowd.[96] The following day Reverend Cox was arrested.[97] The Reverend was ultimately convicted of disturbing the peace, obstructing public passages, and picketing before a courthouse.[98]

In overturning his convictions, the Supreme Court noted that the part of Cox's speech encouraging protesters to sit in at lunch counters "obviously did not deprive the demonstration of its protected character under the Constitution as free speech and assembly."[99] In considering the Reverend's conviction for obstruction of public passages and that statute's impact on First Amendment activity such as organized protests or marches, the Court wrote that "a State or municipality cannot require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while other may not, be disseminated."[100]

Just as the Cox protesters were disbanded ostensibly for disturbing the peace and obstructing public passages but in fact to suppress their speech, so too have Plaintiffs alleged that they were arrested as part of a plan to suppress their constitutionally protected protest activity. Plaintiffs further allege that there was no probable cause to arrest them for the criminal activity they were accused of, Simple obstruction of a highway, in violation of La. R.S. § 14:97. More than 50 years ago, the *Cox* Court declared Baton Rouge law enforcement's brand of restraint on First Amendment activity unconstitutional. The notion that these Defendants were not guided by clearly

---

[96] *Id.* at 543-44.
[97] *Id.*
[98] *Id.* at 538.
[99] *Id.* at 546.
[100] *Id.* at 557 (internal citations omitted.)

established Federal law under the circumstances that presented themselves in July 2016 is directly

contradicted by *Cox*.

The specific authority establishing the Federal law violated by Defendants with respect to

the claims of the Third Amended Complaint is discussed below.

### 1.  Conspiracy under § 1983 and § 1985(3)

The elements of a conspiracy claim under § 1983 are "(1) the existence of a conspiracy

involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a

party to the conspiracy."[101] The Seventh Circuit provides a more detailed definition:

> A civil conspiracy is "a combination of two or more persons acting in concert to commit an individual act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "[c]ircumstantial evidence may provide adequate proof of conspiracy." … Absent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist. Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives. . . .

> A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all participants therein." . . .  An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was "a single plan, the essential nature and general

---

[101] *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).

scope of which [was] known to each person who is to be held responsible for its consequences.[102]

The deprivation must itself be a violation of § 1983.[103] An official who would have qualified immunity for the underlying violation of a federal right under § 1983 is also immune to liability for their participation in a conspiracy to violate that right.[104]

The elements of a conspiracy under § 1985(3) differ slightly in form from those of a § 1983 conspiracy, requiring:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.[105]

The second prong has been interpreted by the Fifth Circuit to require that the conspiracy be motivated by racial animus.[106] But "racial animus" does not require proof of racial hatred or personal prejudice.[107] The EBRSO Defendants state that "Plaintiffs do not and cannot allege that all of the protestors protesting the death of Alton Sterling were Black."[108] They misrepresent the requirements of 1985(3). In interpreting the legislative history of that statute section, the Supreme Court determined that it is the **intent** of the conspirators to which courts should look.[109] It is the "invidiously discriminatory **motivation**" of the conspirators that forms the second element of a

---

[102] *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir. 1979) (internal citations omitted), *rev'd in part and on other grounds* 446 U.S. 754 (1980).
[103] *Id.* at 622.
[104] *Morrow v. Washington*, 672 Fed. App'x 351 (5th Cir. 2016).
[105] *United Broth. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983)
[106] *See, e.g.*, *Lockett v. New Orleans*, 607 F.3d 992, 1002 (5th Cir. 2010)
[107] *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228 (1995) (invidious racial discrimination does not require malignant intent toward the race being discriminated against)
[108] ECF 117-1, 28.
[109] *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

1985(3) conspiracy.[110] That some protesters were not Black, and that some arrestees were not Black, is of no moment.  "The conspiracy, in other words, must **aim** at a deprivation of the equal enjoyment of rights secured by the law to all."[111] Thus, contrary to Defendants' argument, that not all the persons harmed by the conspiracy are Black does not show that the conspiracy itself was not motivated by racial animus.

Importantly, in pleading a conspiracy claim, plaintiffs need not meet "a probability requirement at the pleadings stage; [plausibility] simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement . . . [The facts] [must raise] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[112]

Evidence of a conspiracy under § 1983, as with most conspiracies, will be by circumstantial evidence: "a plaintiff is not required to provide direct evidence of the agreement between coconspirators. . . Absent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist."[113] In weighing circumstantial evidence of the conspiratorial agreement, "[t]he easiest situation in which to draw the inference of agreement is where the parties are on the scene together at the same time performing acts in support of one another."[114]

---

[110] *Id*. (emphasis added).
[111] *Id.* (emphasis added).
[112] *Jabary v. City of Allen*, 547 Fed. App'x 600, 610 (5th Cir. 2013) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)).
[113] *Hampton v. Hanrahan*, 600 F.2d at 621 (7th Cir. 1979).
[114] *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).

Plaintiffs alleged that EBRSO and LPSO Deputies participated in an organized response aimed at suppressing protests in the wake of Alton Sterling's death. They arrived on the scene with tactical gear and acted in concert with other law enforcement agencies to unlawfully arrest scores of protesters. Sheriffs Gautreaux and Ard participated in planning meetings and entered aid agreements, the goal of which was to suppress protests.[115] The individual EBRSO and LPSO deputies participated in and supported the apprehension, arrests, and use of excessive force against individuals, including Plaintiffs, who had violated no law and who were escorted to established stations for purpose of filling out paperwork that included pre-printed and otherwise false affidavits.[116]

The conspirators were motivated by racial animus to violate Plaintiffs' rights. Defendants Gautreaux, Ard, EBRSO Deputies and LPSO Deputies conspired with BRPD, an organization whose history of racially discriminatory policing is long and notorious.[117]

As to whether engaging in a § 1983 conspiracy violates clearly established civil rights, one has to look at whether the underlying constitutional or statutory violation has been clearly established. Gautreaux and EBRSO Deputies argue that liability for a § 1983 conspiracy is not clearly established and point to the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).[118] The *Ziglar* decision, however, is easily distinguishable in that the ruling was limited to determining that there was disagreement among the courts of appeal as to whether

---

[115] TAC at 37 ¶ 274.
[116] *Id*. at ¶¶ 286–89, 298–300, 304–05, 311–17, 330-33, 338-40, 343, 347–50, 354–55; 359–63, 366-67
[117] *Id*. ¶¶ 243–62
[118] ECF No. 117-1 at 26.

officials **employed by the same governmental department** can "conspire" when they speak to each other or work together.[119]   In the present case, the alleged conspiracy is among multiple independent law enforcement agencies as well as the City/Parish, the Louisiana Sheriffs Association, and various individuals outside of any law enforcement agency. There is no ambiguity in the law as to whether agents of different government entities can conspire with one another. [120]

LPSO Defendants, in support of their contention that Plaintiffs' conspiracy claims are insufficiently pleaded and contain only conclusory allegations, draw comparisons between Plaintiffs' Complaint and the following cases: *Ashcroft v. Iqbal*;[121] *Jabary v. Allen*;[122] *Zuniga v. Masse Contracting*;[123] and *Anderson v. Louisiana*.[124] The pleadings in each of these cases is easily distinguishable from Plaintiffs' Complaint.

*Iqbal*, by the time it reached the Supreme Court, was a constitutional challenge only to the government's alleged "'policy of holding post-September-11th detainees' [in more restrictive conditions of confinement] once they were categorized as 'of high interest'" due to their race, religion, or national origin.[125] Iqbal's complaint, however, had not alleged such an impermissible motive against the opposing parties to the appeal: John Ashcroft and Robert Mueller.[126] He alleged only that they had adopted "a policy approving 'restrictive conditions of confinement' for post-

---

[119] *Id*. at 1868.
[120] *See*, *e.g.*, *Rauen v. City of Miami*, No. 06-21182-CIV. 2007 WL 686609 (S.D. Fla. March 2, 2007) (discussed at length below).
[121] 556 U.S. 662 (2009)
[122]  547 Fed. App'x 600 (5th Cir. 2013)
[123] No. 16-cv-13909, 2017 WL 5572741 (E.D. La. Nov. 20, 2017)
[124] No. 10-cv-1448, 2011 WL 3664859 (W.D. La. July 11, 2011)
[125] 556 U.S. at 682.
[126] *Id*. at 682–83.

September-11 detainees until they were 'cleared' by the FBI."[127] More specific factual allegations of the discriminatory actions of their subordinates did not suffice to state a claim against Ashcroft and Mueller in a *Bivens* action—where respondeat superior is not an available theory of liability.[128]

The *Iqbal* decision heavily references *Bell Atlantic Corp. v. Twombly*,[129] which itself lends support for the sufficiency of Plaintiffs' pleading in this case. *Twombly* was a consumer suit alleging an antitrust conspiracy among the regional telephone providers that emerged from the breakup of AT&T in 1984, known as "Incumbent Local Exchange Carriers" ("ILECs"), to prevent entry into the market by "Competitive Local Exchange Carriers" ("CLECs").[130]

As the *Twombly* court noted "The nub of the complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience."[131] The plaintiffs did not directly allege the existence of an illegal agreement but instead relied on parallel conduct of the ILECs. The court concluded that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice."[132]

By contrast, the Plaintiffs in the case at bar do not allege parallel—that is to say, non-coordinated—conduct. Instead, they allege joint action on a massive scale by multiple law enforcement agencies, requiring considerable coordination and communication. They allege that

---

[127] *Id*. at 683.
[128] *Id*.
[129] 550 U.S. 544 (2007)
[130] *Id*. at 549.
[131] *Id*. at 565.
[132] *Id*. at 556.

this was accomplished through multiple avenues and official meetings, including GOHSEP, MOHSEP, and the Louisiana Sheriff's Association. This is the "unity of purpose, common design, and understanding, or meeting of the minds in an unlawful arrangement" that are sufficient pleading of an agreement.[133]

*Rauen v. City of Miami*,[134] discussed above with respect to the problem of unidentified defendants, is instructive on this point also. *Rauen* involved law enforcement responses to protests in Miami during international Free Trade of the Americas meetings. The plaintiff protesters alleged coordination of multiple law enforcement agencies by means of an "unwritten agreement to suppress dissent at the FTAA through a show of overwhelming force, thereby violating the First Amendment rights of speech, assembly, and association of Plaintiffs and other demonstrators."[135] This agreement, according to the plaintiffs, was formed in the course of a series of meetings by the leadership of the various law enforcement agencies in the months leading up to the FTAA.[136] Plaintiffs alleged that each of these agencies participated in the policies that allegedly resulted in violations of Plaintiffs' constitutional rights and that those agencies, in essence, acted as a single entity.[137] The district court found that these allegations were sufficient to allege a conspiracy to violate the civil rights of the protesters actionable under §1983.

LPSO Defendants cite to *Jabary v. Allen*, which can also be distinguished upon the specificity of facts alleged in its complaint. A restaurant owner brought a § 1983 conspiracy claim against city officials for the revocation of his occupancy license. He alleged:

---

[133] *See Gopalam v. Smith*, No. 12-cv-542-JJB, 2014 WL 518199 *3 (M.D. La. Feb. 6, 2014).
[134] No. 06-21182-CIV. 2007 WL 686609 (S.D. Fla. March 2, 2007)
[135] *Id*. at *12.
[136] *Id*. at *1.
[137] *Id*.

overt acts that local officials "held private meetings to devise a method of shutting down Jabary Mediterranean" and that they "actively conspired" with each other to "destroy Jabary's civil rights." Other allegations include that there were "several conversations, private meetings, and other communications" that took place to further their conspiracy to "deprive Jabary of his civil rights and the due process of the law." Such statements are conclusory in nature. Without more background facts, Jabary is unable to demonstrate the existence of the local officials' alleged agreement to the level of plausibility necessary to pass scrutiny under Rule 12(b)(6). The times, places, and other circumstances of the "private meetings" and secret conversations are notably absent.[138]

Plaintiffs' allegations of Defendants' conduct in the present case are significantly more detailed that the allegations in the *Jabary* complaint. Furthermore, the overt acts of the conspiracy and their nature have a large bearing on their tendency to prove the existence of an agreement. Contrast the denial of a single occupancy license versus the mobilization of hundreds of law enforcement officers from multiple agencies over a period of days to suppress the rights of thousands of peaceful protesters and the resulting arrests.

*Zuniga v. Masse Contracting* is similarly inapposite. The court in *Zuniga* found that the plaintiffs had not alleged sufficient facts to support a § 1985(3) conspiratorial agreement, and had instead made only conclusory allegations as to the existence of a conspiracy.[139] The *Zuniga* plaintiffs' complaint contained only three paragraphs alleging a conspiracy, each of which were bare allegations such as "Defendants formed a conspiracy . . . .," "Defendants conspired to create a facility . . . .," and "Defendants formed a conspiracy . . . ."[140] The complaint lacked the factual allegations that give rise to the plausible existence of an agreement, such as multiple meetings

---

[138] 547 Fed. App'x at 611
[139] 2017 WL 5572741 * 4.
[140] *Zuniga*, No. 16-cv-13909-JTM-JVM, ECF No. 24 ¶¶ 10, 16, 17 (E.D. La. Feb. 7, 2017).

among agency leaders and final policymakers, the coordination of hundreds of specialized law enforcement officers, military-grade vehicles, and arrest procedures over multiple days.

Finally, LPSO cites to *Anderson v. Louisiana* as a case whose pleading is supposedly analogous to Plaintiffs' Complaint in its insufficiency. Anderson's was a pro-se complaint whose allegations of conspiracy were merely "bald assertions" that were "not supported by specific facts[.]"[141] The complaint included general accusations of officials' "unspecified public accusations," "negative rumors," and "total disregard" for one of the plaintiffs, and alleged simply that "[t]he defendants have acted together and separately in violation of the plaintiffs' constitutional rights. . . . Defendants conspired in the intentional false arrest of Samella Anderson and Author Anderson, charged both with felony crimes that they never committed, fabricated reports to support the charges, and to cause defamation to Author Anderson and Samella Anderson."[142] The plaintiffs pleaded no facts as to the concerted acts of the officials in question or the existence of an agreement between them.

In contrast to the cases cited by the defendants, Plaintiffs have pleaded specific facts that allege that defendants and/or their superiors or agents and others held meetings on specified dates and specified locations at which the conspirators entered into an agreement to violate the civil rights of Plaintiffs and others for the unlawful purpose of silencing their criticism of the police department. Plaintiffs have specifically pled that the conspirators were motivated by racial animus. And Plaintiffs have pled that *all* defendants who now seek dismissal of the claims against them participated in the organized law enforcement response to the protests that violated Plaintiffs'

---

[141] 2011 WL 3664859 *7.
[142] *Anderson*, Complaint, ECF No. 5 ¶¶ 18, 67, No. 10-cv-1448-RGJ-KLH, (W.D. La. Oct. 8, 2010).

rights. Plaintiffs have thus met the pleading burden on their § 1983 and § 1985(3) conspiracy claims, and now turn to the underlying allegations of civil rights violations.

### 2. False detention, arrest, and imprisonment

Plaintiffs allege that their detention, arrest, and imprisonment without probable cause at the hands of EBRSO and LPSO Defendants, either directly or as an overt act of the conspiracy of which they were a part, violated Plaintiffs' Fourth Amendment rights.[143] Plaintiffs alleged that they were peacefully protesting, not obstructing a public highway, and were detained pursuant to false affidavits of probable cause.[144]

A detention or arrest that lacks probable cause is a Fourth Amendment violation actionable under § 1983. *Manuel v. City of Joliet*, 137 S. Ct. 911, 917–19 (2017); *see also Davidson v. City of Stafford, Tex.*, 848 F.3d 384 (5th Cir. 2017) (holding that arrest and detention of a protester was devoid of both actual and arguable probable cause under a Texas statute criminalizing obstruction of a highway).

The proposition that a detention and arrest without probable cause violates constitutional rights was clearly established at the time of Plaintiffs' arrests.[145]

The LPSO and EBRSO defendants contend that Plaintiffs do not specifically name them as the officers who perpetrated their unlawful detention, arrest, and imprisonment. As Plaintiffs

---

[143] TAC ¶¶ 404–06.
[144] *Id*. at ¶¶ 290, 294 – Leroy and Deon Tennart; ¶¶ 301, 304-05 – Eddie and Godavari Hughes; ¶¶ 311, 331, 333 – Brachell and Christopher Brown; ¶¶ 339-40, 343 – Elcide Harris; ¶¶ 346-49, 353-54 – Zachary Hill; ¶¶ 359-61, 363, 366 – Thomas Hutcherson.
[145] *See Davidson*, 848 F.3d at 393–94 ("[T]here was fulsome case law clearly establishing that an arrest without probable cause violates both First and Fourth Amendment rights at the time of Davidson's arrest in 2013.")

have pleaded, it is these defendants' own conduct that prevents Plaintiffs from being able to plead these facts more specifically.[146] Additionally, Defendants take an overly narrow view of who Plaintiffs have alleged were involved in their arrests. The EBRSO defendants argue:

> Plaintiffs specifically name Baton Rouge Police Department ("BRPD") as the arresting officers. Plaintiffs also allege that certain named BRPD officers "were involved in the detention, restrain, (sic) arrest and/or use of excessive force against one or more Plaintiffs." In contrast, Plaintiffs allege that EBRSO law enforcement officers were on duty and physically present during Plaintiffs' arrests or were on duty and physically present during the protests at Airline Highway when Plaintiffs were arrested.[147]

Similarly, the LPSO defendants list specific BRPD officers who Plaintiffs have alleged assisted with or supported their arrests and detentions. The LPSO defendants then write that "Notably, none of the defendants filing this motion (i.e., the LPSO defendants) are alleged to have effected any arrest or to have participated, assisted, supported, or otherwise had any involvement in the subject arrests."[148]

These arguments simply misrepresent Plaintiffs' pleading. Plaintiffs have pleaded at length the involvement of EBRSO and LPSO defendants in their unlawful arrests, detentions, and imprisonments in the Third Amended Complaint.[149] As Plaintiffs have stated throughout their

---

[146] TAC ¶ 280 ("Defendants' coordinated plan sought to . . . . insulate individual officers from accountability, criticism or consequence for their role in Defendants' scheme by encouraging and/or allowing officers to cover the names and badge numbers on their uniforms with opaque tape and to refuse to give their names or badge numbers when asked directly by civilians[.]")

[147] ECF 117-1, 11.

[148] ECF 122-1, 8.

[149] *See, e.g.*, TAC ¶¶ 284–89 (describing members of multiple law enforcement agencies, including EBRSO and LPSO, blocking traffic, marching toward protesters with intimidating equipment, pushing protesters into the street with their batons, tackling Plaintiff Leroy Tennart and arresting him, and striking Plaintiff Deon Tennart in the face with a shield and arresting him.); ¶¶ 298–99 (describing how some or all Defendants, including the EBRSO and LPSO Defendants, blocked the path of protesters and began marching toward the protesters, leading to the arrest of Plaintiff Godavari Hughes by an unknown EBRSO deputy,); ¶ 311(describing multiple unknown officers, including some or all of the EBRSO and LPSO defendants, engaging with protesters by throwing them to the ground, brandishing

Complaint, the conduct of these defendants extends far beyond mere "physical[] presen[ce]" and clearly illustrates these officers' "assist[ance]" and "support" in Plaintiffs arrests. The fact that Plaintiffs cannot plead these facts with the specificity these defendants would like is because that information is exclusively within the control of these defendants, who have refused to give it to Plaintiffs, despite repeated requests.

**3. <u>Manufacturing of evidence and its knowing use in an attempt to obtain institution of prosecution</u>**

Plaintiffs allege that EBRSO and LPSO Defendants are liable for the falsification of probable cause affidavits that were used to justify the Plaintiffs' seizure and detention. While Plaintiffs have alleged specifically that various members of the BRPD executed these falsified affidavits, EBRSO and LPSO Defendants are liable to the extent they cooperated in the planning and production of these pre-printed affidavits, participated in Plaintiffs' physical seizure and detention, or otherwise entered into a conspiracy to use such false instruments.

In *Good v. Curtis*,[150] the panel held that the swearing out of a false affidavit of probable cause that was used to detain and initiate the prosecution of a person was a violation of the Fourth Amendment such that "any reasonable official would know that framing an individual for a crime they did not commit . . . represents a constitutional violation."[151] This had been the law of the Circuit since at least 2003, when in deciding *Castellano v. Fragozo*, the court held that the use of

---

firearms at them, rushing Plaintiffs Brachell and Christopher Brown from behind, tackling them to the ground and arresting them); ¶ 339 (describing the seizure of Plaintiff Elcide Harris by unknown defendants, including employees of the EBRSO); ¶ 349 (describing the tackling to the ground of Plaintiff Zachary Hill by unknown defendants which could include EBRSO defendants); ¶ 361-62 (describing the violent attack of unknown defendants, including potential EBRSO defendants, on Plaintiff Thomas Hutcherson and their aggressive arrest of him).
[150] 601 F.3d 393 (5th Cir. 2010).
[151] *Id*. at 401.

a false affidavit to establish probable cause for an arrest warrant was a violation of Fourth Amendment rights.[152] Although the case focused on determining whether a malicious-prosecution claim arose from the Fourth Amendment or instead the Due Process Clause of the Fourteenth Amendment, the court was clear in its view that a *pretrial* seizure and detention lacking probable cause was a Fourth Amendment violation.

The use of pre-printed probable cause affidavits, executed by officers who were not Plaintiffs' arresting officers, attesting to events that did not occur, and which were used as a justification for Plaintiffs' arrests and detention was a violation of Plaintiffs' clearly established Fourth Amendment rights.

### 4.   Excessive Use of Force

To establish a § 1983 claim for excessive force under the Fourth Amendment, a plaintiff must first show that she was seized.[153]  The plaintiff must then "show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable."[154] EBRSO and LPSO Defendants contend that Plaintiffs cannot possibly sustain a use of excessive force claim because Defendants were not personally involved in arresting or detaining anyone. Plaintiffs have addressed this argument in Sections II.C and III above. The facts alleged by Plaintiffs Chris Brown, Brachell Brown, Elcide Harris, Zachary Hill, Thomas Hutcherson, Leroy Tennart, and Deon Tennart are sufficiently pleaded to give rise to their claim of excessive use of force.

---

[152] 352 F.3d 939, 953–55 (5th Cir. 2003).
[153] *Flores v. Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).
[154] *Id.*

The Fifth Circuit has determined that one must look at the context in which the force is deployed to determine whether an excessive use of force has occurred.[155] Indeed, the Fifth Circuit makes clear that when determining "the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force, paying careful attention to the facts and circumstances of each particular case."[156]

The Fifth Circuit has previously stated that a constitutional violation can occur "when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest."[157] A plaintiff need not have to establish a significant injury in the Fourth Amendment context, but only that they suffered some form of injury.[158] The Fifth Circuit has also held that the right to be free from such uses of force was clearly established as early as 2008.[159]

As discussed in Section III above,  Plaintiffs have alleged specific actions by Defendants, including EBRSO and LPSO Defendants, which constitute excessive force resulting in physical and emotional injuries to them, including head and face injuries, taser-related injuries, and scrapes and bruises. Moreover, Plaintiffs have pleaded that they were lawfully and peacefully protesting at the time of their arrests and the uses of excessive force against them.[160] Those Plaintiffs with excessive force claims have therefore met their pleading burden.

--------

[155] *Ikerd v. Blair,* 101 F.3d 430, 434 (5th Cir.1996).
[156] *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008).
[157] *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 731 (5th Cir. 2018) (citing *Ramirez*, 716 F.3d at 377–78; *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)).
[158] *Williams v. Bramer*, 180 F. 3d 699, 703 (5th Cir. 1999) (applying *Hudson v. MacMillian,* 503 U.S. 1, 8 (1992)).
[159] *Darden*, 880 F.3d at 733 (citing *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008).
[160] See n. 51, *infra*.

5. **Retaliatory Arrest**

Plaintiffs allege that EBRSO and LPSO Defendants conspired in or directly participated in their arrests, without probable cause, as retaliation for the exercise of their First Amendment rights to freedom of speech.[161] The result of Defendants' retaliatory arrests, which included incarceration, physical injury, and public humiliation, were sufficiently harmful to have an objectively chilling effect upon an ordinary person's exercise of free speech.

The elements of a retaliatory arrest claim are: "(1) [plaintiff was] engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."[162] If a retaliatory arrest is made without probable cause, or in a way such that no reasonable police officer could have believed probable cause existed, then the arrest violated clearly established law.[163]

Thus Plaintiffs have pleaded that Defendants, as they acted in furtherance of a conspiracy to suppress protesters' First Amendment rights, lacked probable cause to arrest Plaintiffs under La. R.S. § 14:97 or any other statute. This is a violation of a constitutional right that is clearly established in Fifth Circuit case law.

---

[161] ECF No. 56 ¶¶ 416–21.
[162] *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).
[163] *Id.* at 261–62; *see also Allen v. Cisneros*, 815 F.3d 239, 244-45 (5th Cir. 2016) (holding lack of probable cause is an element of retaliatory arrest claim).

6. **Failure to Intervene**

EBRSO and LPSO Defendants claim that a failure to intervene, or bystander liability, claim must fail because their deputies were not physically present. In the alternative, they argue that their deputies' presence is not enough to create liability. Either way, Defendants' arguments fail.

The Third Amended Complaint alleges that the EBRSO and LPSO deputies were present at Airline and Goodwood at the time of the Plaintiffs' arrests. "[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[164] In *Dotson v. Edmonson*,[165] the district court denied summary judgment on qualified immunity with respect to an allegedly false arrest in October 2015 on grounds that the principles of *Whitley*[166] clearly established that "a non-arresting officer may be liable for the false arrest of a civilian where the non-arresting officer has knowledge that the arrest is made without probable cause, has a reasonable opportunity to prevent the harm, and chooses not to act."[167]

---

[164] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (*citing Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)

[165] 2018 WL 501512 at *8 (E.D. La. Jan. 22, 2018)

[166] Defendants cite *Perez v. Tedford*, No. SA-13-CV-429, 2013 WL 5740256 (Oct. 22, 2013) for the proposition contrary to *Dotson*. *Perez*, however, does not cite *Whitley* and therefore does not distinguish the general rule cited in that 2013 Fifth Circuit case. *Whitley* and *Dotson* stand for the proposition that the clearly established law for purposes of a failure to intervene claim is based on the failure to stop "a violation of an individual's constitutional rights" by another officer – not the artificially narrower question of whether the right involved is the right to be free from excessive force, the right to be free from arrests without probable cause, or as here, the right to be free from entry on one's land without permission.

[167] Similarly, in *Wilkerson v. Seymour*, 736 F.3d 974, 979-80 (11th Cir. 2013) the Eleventh Circuit interpreted *Jones v. Cannon*, 174 F.3d 1271, 1283-84 (11th Cir. 1999) as standing for the proposition that, "where an officer was present during an arrest and knew that the arresting officer had no reasonable basis for arguable probable cause, the non-arresting officer could be liable under § 1983 if he was sufficiently involved in the arrest." In *Wilkerson* and *Jones*, the Eleventh Circuit interpreted the clearly established law supporting the "failure to intervene" claim at the same generality as that applied by the Fifth Circuit in *Whitley* and the district court in *Dotson*.

Every EBRSO or LPSO deputy on the scene at the time – whether in the Mobile Field Force, the "processing stations," or coordinating the activities – had an opportunity to stop the use of excessive force against Plaintiffs Leroy Tennart, Elcide Harris, Zachary Hill, Brachell Brown, Christopher Brown, and Thomas Hutcherson. Every EBRSO or LPSO deputy on the scene at the time – whether in the Mobile Field Force, the "processing stations," or coordinating the activities of others – had an opportunity to stop the false arrest of the Plaintiffs for "simple obstruction of a highway," when it was plain Plaintiffs were doing no such thing.

Clearly illustrating the pitfalls of their reasoning, Defendants again shift blame to other law enforcement agencies by pinpointing them as the primary tortfeasors. The Plaintiffs have not limited these allegations to non-EBRSO and LPSO defendants. Moreover, the proposition that a state actor's failure to intervene violates constitutional rights was clearly established at the time of Plaintiffs' arrests. The Fifth Circuit has established that a bystander liability claim is not limited to people within the same law enforcement agency, but to people across agencies.[168]

Because the injury can occur at some place other than arrest and the injury need not be significant, it is important to consider the coordination and support that both defendant groups provided, which contradicts the argument that they were merely present. As Plaintiffs have specifically pleaded that the EBRSO and LPSO defendants were actively involved in the law enforcement activities that led up to and included the violations of their rights.

7. **Deliberate Indifference to Medical Needs**

EBRSO Defendants deny liability for deliberate indifference to medical needs on the grounds they were unaware that named plaintiffs needed medical attention. Their assertion fails

---

[168] *Hale v. Townley,* 45 F.3d 914, 919 (5th Cir. 1995) (citing *Harris v. Chanclor*, 537 F.2d 203, 205-06 (5th Cir. 1976).

because the proposition that a deliberate indifference to medical needs violates constitutional rights was clearly established at the time of Plaintiffs' arrests. To substantiate a claim of indifference, plaintiff must show the official knew and completely disregarded the substantial risk of serious harm.[169] This is otherwise known as deliberate indifference.[170] To achieve deliberate indifference, the conduct must be callous, or reckless.[171] In *Smith,* the United States Supreme Court also stated that defendant (a prison guard) cannot rely solely upon its immunity because it is "coextensive with the interest it protects."[172] The immunity is qualified because it

> reflects a recognition there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners in his charge. Once the protected sphere of privilege is exceeded, we see no reason why state officers should not be liable for their reckless misconduct on the same basis as a private tortfeasor.

*Id.*

Plaintiffs Leroy Tennart,[173] Christopher Brown,[174] Elcide Harris,[175] Zachary Hill,[176] and Thomas Hutcherson[177] all informed EBRSO jailors they were in need of medical attention, but never received medical care.  Not only was Christopher Brown never attended to, he was in fact

---

[169] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). However, in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), the adjudication of deliberate indifference as to the treatment of pre-trial detainees should incorporate an objective, rather than subjective, standard. *Cf. Castro v. County of Los Angeles*, 833 F.3d 1060, 1069-70 (9th Cir. 2016) (en banc). *But see Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (declining to apply *Kingsley* outside of excessive force claims); *Robertson v. Gautreaux*, No. 16-341-JJB-RLB, 2017 WL 690542 (M.D. La. Feb. 21, 2017) (same).
[170] *Id.*
[171] *Smith v. Wade*, 461 U.S. 30 (1983).
[172] *Id.* at 55.
[173] ECF 56, ¶ 291.
[174] *Id*. at  ¶ 319.
[175] *Id*. at ¶ 341.
[176] *Id*. at ¶ 352.
[177] *Id*. at ¶ 364.

pepper sprayed multiple times while detained at the jail.[178] As Plaintiffs have pleaded, as the final policymaker for the jail, Defendant Sheriff Gautreaux was on notice of the history of his office's alleged deliberate indifference to serious medical needs, as well as EBRSO jailers' pepper spraying of individuals detained at the jail.[179]

### E.  Sufficiency of State Law Claims

Defendants attempt to dismiss Plaintiffs' state law claims in the same manner with which they treat Plaintiffs' federal claims – by taking advantage of Defendants' scheme to insulate individual officers from accountability through the deliberate concealment of their identities during the activities underlying the Complaint. The special considerations Plaintiffs have outlined in Section II(C), above, related to plaintiffs' inability to specifically identify the actions individual Defendants apply with equal force to these claims.

Moreover, because the EBRSO and LPSO defendants were acting in the course and scope of their employment, Defendants Gautreaux and Ard are therefore liable under the doctrine of *respondeat superior.*[180]

### 1.  <u>State Law Claim for Civil Conspiracy to Violate Plaintiffs' Rights</u>

Louisiana Civil Code article 2324 states that one "who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." This provision of Louisiana's Civil Code is not itself a cause of action but

---

[178] *Id*. at ¶ 320, 324.
[179] *Id*. at ¶ 264.
[180] *LeBrane v. Lewis*, 292 So. 2d 216, 218 (La. 1974).

instead a theory of liability for the underlying tort.[181] The conspiracy action is "for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged the performance of those acts."[182] "In order to recover under this theory of liability, a plaintiff must prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiff's injury ... The plaintiff must establish that there was an agreement as to the intended outcome or result."[183] Proof of a conspiracy can be by "actual knowledge, overt actions with another . . . or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator."[184]

> The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. This assistance or encouragement must be of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy.[185]

Plaintiffs have pleaded an agreement among the leaders of the EBRSO and LPSO to commit their offices to a conspiracy to violate the rights of protesters of police violence in Baton Rouge.[186] Plaintiffs have specifically pleaded that Defendants, including the EBRSO and LPSO defendants and their commanding Defendant Sheriffs, colluded to accomplish the object of their conspiracy "through the use of "intimidation, excessive force, illegal arrests, illegal detention, denigration, and criminalization."[187] Plaintiffs then pleaded specific conduct by the moving defendants and their co-conspirators that constitutes the tortious acts underlying the conspiracy,

---

[181] *See Laird v. State Farm Fire and Casualty Co.*, No. 16-707-JWD-RLB, 2017 WL 2239578 *12 (M.D. La. May 22, 2017).

[182] *Chrysler Credit Corp. v. Whitney Nat'l Bank,* 51 F.3d 553, 557 (5th Cir. 1995) (citing *National Union Fire Ins. Co. v. Spillars,* 552 So. 2d 627, 634 (La. App. 2 Cir. 1989).

[183] *Laird* at *12 (internal citations omitted).

[184] *Stephens v. Bail Enforcement of Louisiana,* 96-0809, p. 10 (La. App. 1 Cir. 2/14/97), 690 So. 2d 124, 131.

[185] *Chrysler Credit Corp. v. Whitney Nat'l Bank,* 51 F. 3d 553, 557 (5th Cir. 1995).

[186] ECF 56 ¶ 273.

[187] *Id*.

including intentional infliction of emotional distress, assault, battery, false arrest, false imprisonment, violations of the Louisiana constitutional rights to privacy, to be left alone and the rights of the accused, and abuse of rights and abuse of process, as more fully discussed below.

As with their defenses to the federal conspiracies, the EBRSO and LPSO defendants argue that the state civil conspiracy claim against them and the underlying tort claims cannot be sustained because each individual EBRSO and LPSO defendant is not pleaded as being specifically involved in each underlying tortious act. These defendants misunderstand the law of an article 2324 conspiracy. At a minimum, Plaintiffs have pleaded the "overt actions with another" of these EBRSO and LPSO defendants, who joined ranks with their co-conspirators to block the paths of protesters, obstruct their movement, intimidate them with shows of military-style equipment and long guns, use force against them, and arrest them, despite the obvious fact that the protesters were doing nothing wrong.[188] Plaintiffs have also pleaded the "actual knowledge" of these defendants, who Plaintiffs have pleaded were physically present and thus able to see the overt acts of their co-conspirators.[189] Given the high level of coordination of hundreds of officers over a period of hours and days that Plaintiffs describe in their Complaint, Plaintiffs have pleaded that the "assistance or encouragement" offered by the moving defendant conspirators was "of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy." Moreover, for the same reasons the Plaintiffs have established that Defendants' conduct violated clearly established law,[190] they have demonstrated "the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator."

---

[188] *See, e.g., Id.* at ¶¶ 284-89, 298-99, 310-314, 338-39, 347, 349, 359-62.
[189] *Id.*
[190] See Section IV.D. supra.

To the degree that Plaintiffs cannot at this time know precisely which of these defendants conducted which action as a result of their deliberate concealment of their identities, limited discovery is appropriate. But Plaintiffs' claims should not be dismissed solely for this reason, as discussed more fully in Plaintiffs' Opposition to these Defendants' Motion to Stay Discovery.

## 2. State Law Claims for Violations of the Free Expression protections of the Louisiana Constitution

The freedom of speech protections in Louisiana's constitution are interpreted co-extensively with the U.S. Constitution's First Amendment protections.[191]

Plaintiffs therefore refer to the discussion in Section IV.D.5, *supra*, which argues the sufficiency of Plaintiffs' claims for arrest in retaliation of exercise of their rights to free speech under the First Amendment.

## 3. State Law Claims for Intentional Torts, including Intentional Infliction of Emotional Distress, Assault, Battery, False Arrest, and False Imprisonment

In order to make out a claim for intentional infliction of emotional distress, a plaintiff must establish "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain

---

[191] *See, e.g.*, *State v. Franzone*, 384 So. 2d 409, 411 (La. 1980) ("We are satisfied that our state constitution's guarantee of these liberties [protection against prior restraint] was designed to serve the same purpose and provides at least coextensive protection."); *see also City of Baton Rouge v. Ross*, 94-0695 (La. 4/28/95), 654 So. 2d 1311, 1335–37. (Calogero, C.J., concurring) ("[T]he express terms of Louisiana's 1974 Constitution give no guidance on where the line between the freedom of expression and the government's authority to proscribe criminal conduct should be drawn, and in this Court's jurisprudence the issue is res nova. Therefore, as this Court has at other times in the much-litigated First Amendment context, I look to federal constitutional jurisprudence to guide my consideration of corollary state constitutional provisions.");

to result from his conduct."[192] Plaintiffs have alleged, among other things, that Defendants, including the EBRSO and LPSO defendants, used riot gear, batons, and rifles in order to intimidate them;[193] "tackled" them and shoved them into the streets using their batons;[194] hit them in the face with military-style equipment;[195] blocked their path and marched toward them *en masse* in an intimidating display of force;[196] threw them to the ground as they saw law enforcement officers brandish firearms at unarmed, peaceful protesters;[197] and tased one of them[198]—despite the fact that Plaintiffs had done absolutely nothing wrong. Such conduct by sworn law enforcement officers against law-abiding residents is "extreme and outrageous" and is highly likely to cause severe emotional distress as it has here. Moreover, any law enforcement officer who engaged in such conduct would surely know that severe emotional distress would be certain or at least substantially certain to result.

Under Louisiana law, a battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." Here, the following allegations in Plaintiffs' complaint easily meet that standard: Defendants' shoving and tackling of Leroy Tennart and smashing of Deon Tennart's face with a shield;[199] Defendants' tackling of Brachell

---

[192] *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).
[193] TAC ¶ 59.
[194] *Id*. at ¶ 284-89.
[195] *Id*.
[196] *Id*. ¶¶ 298–99.
[197] *Id*. ¶ 311.
[198] *Id*.
[199] *Id*. ¶¶ 284–89.

and Christopher Brown and tasing of Christopher Brown;[200] Defendants' tackling of Zachary Hill;[201] and Defendants' violent yanking on and charging of Thomas Hutcherson.[202]

An assault occurs under Louisiana law "when an intentional threat of battery, or harmful or offensive contact, places one in reasonable apprehension of receiving an injury."[203] The same allegations that support Plaintiffs' claims for battery and intentional infliction of emotional distress also support their claims for assault.

"False arrest is not distinguished as a separate tort from false imprisonment."[204] This tort "occur[s] when one arrests and restrains another against his will without a warrant or other statutory authority."[205] As one Louisiana Supreme Court justice has explained, "[t]he critical issue is whether the police had probable cause to arrest plaintiff at the time he was arrested[.]"[206] In the instant case, Plaintiffs have pleaded that they were arrested without a warrant and with no probable cause to support their arrests, as they had committed no crime.[207] Thus, all defendants who participated in their arrests – including EBRSO and LPSO Defendants – are liable for false arrest and false imprisonment.

---

[200] *Id.* ¶ 311.
[201] *Id.* ¶ 349.
[202] *Id.* ¶ 361.
[203] *Gressett v. Southwest Airlines Company*, 216 F. Supp. 3d 743, 750 (E.D. La. 2016) (citing *McVay v. Delchamps, Inc.,* 707 So.2d 90, 93 (La. App. 5 Cir. 1/14/98); *Castiglione v. Galpin,* 325 So.2d 725, 726 (La. App. 4 Cir. 1976); *State in re Cortez,* 319 So. 2d 496, 497 (La. App. 4 Cir. 1975).
[204] *Parker v. Town of Woodworth*, 11-1275, p. 3 (La. App. 3 Cir. 3/7/12); 86 So. 3d 141, 144.
[205] *Kyle v. City of New Orleans*, 353 So. 2d 969, 971 (La. 1977).
[206] *Gibson v. State*, 1999-1730, p. 10 (La. 2/25/00); 758 So. 2d 782, 791 (Lemmon, J., concurring).
[207] ECF 56 ¶¶ 290-292 (Leroy and Deon Tennart); ¶¶ 299-301 (Eddie and Godavari Hughes); ¶¶ 316-317, 329 (Brachell and Christopher Brown); ¶ 339-342 (Elcide Harris); ¶¶ 347-53 (Zachary Hill); ¶¶ 360-63 (Thomas Hutcherson).

4. **State Law Claims For Violations Of The Right To Privacy, The Right To Be Left Alone, And The Rights Of The Accused**

Article One, Section Five of the Louisiana Constitution secures for this state's residents the right to "be secure in [their] person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." LA. CONST. art. I § 5. This section of Louisiana's Constitution "is not a duplicate of the Fourth Amendment or merely coextensive with it; it is one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution."[208] Plaintiffs' allegations related to all federal Fourth Amendment claims thus apply to Plaintiffs' claims related to their right to privacy and right to be left alone under the Louisiana Constitution.

5. **Abuse of Rights**

An abuse of right claim arises when a party exercises a legal right "with the primary intention of harming or imposing a detriment upon another."[209] In order to prevail on a claim of abuse of right, a plaintiff must meet one of four conditions: "(1) the predominant motive for exercise of the right is to cause harm; (2) there is no serious or legitimate motive for exercise of the right; (3) the exercise of the right violates moral rules, good faith, or elementary fairness; or (4) the exercise of the right is for a purpose other than that for which it was granted."[210]

The right that these Defendants abused was their right to use force, make arrests, and otherwise carry out their law enforcement duties. The Louisiana Code of Criminal Procedure

---

[208] *State v. Hernandez*, 410 So. 2d 1381, 1385 (La. 1982).
[209] *Insulation Technologies, Inc. v. Industrial Labor and Equipment Services, Inc.*, 2013-0194, p. 8–9 (La. App. 4 Cir. 8/14/13); 122 So. 3d 1146, 1151.
[210] *Lee v. Pennington*, 2002-0381, p. 8 (La. App. 4 Cir. 10/16/02); 830 So. 2d 1037, 1043.

codifies the authority of law enforcement officers to effect arrests, use force, and otherwise control individuals unwilling to submit to their authority: "The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." LA. CODE CRIM. PROC. art. 220. The Louisiana Supreme Court has recognized that "[t]he use of force when necessary to make an arrest is a legitimate police function."[211]

Plaintiffs have alleged sufficient facts to plead each of the four conditions upon which an abuse of right claim may be based: (1) "Defendants . . . developed and implemented a strategy . . . to silence this peaceful and lawful exercise of First Amendment rights . . . through the use of . . . intimidation, excessive force, illegal arrests, [and] illegal detention."[212] In other words, Plaintiffs have alleged that Defendants used their rights as sworn law enforcement officers to institute arrests, shows of force, and uses of force with the "predominant motive" of silencing peaceful and lawful First Amendment-protected activity. (2) Plaintiffs have also alleged that there was "no serious or legitimate motive for exercise of the right," as Plaintiffs have alleged they and other arrested protesters were peacefully and lawfully protesting.[213] (3) The exercise of Defendants' conduct "violates moral rules, good faith, or elementary fairness" as it resulted in the intimidation and abuse of scores of peaceful and law-abiding protesters.[214] (4) The exercise of the Defendant's right was "for a purpose other than that for which it was granted" as Defendants did not use their

---

[211] *Kyle v. City of New Orleans*, 353 So.2d 969, 973 (La. 1977).
[212] ECF 56 ¶ 273.
[213] *Id*. at ¶ 281.
[214] *Id*. at ¶ 279-81.

rights to maintain order but rather to abuse Plaintiffs' and other protesters' rights in order to silence their dissent.[215]

### 6.  **Abuse of Process**

To establish an abuse of process, a plaintiff must prove (1) the existence of an ulterior purpose; and (2) a "willful act in the use of the process not in the regular prosecution of the proceeding."[216] In the instant case, Plaintiffs have pleaded that Defendants "set out to arrest the protesters without probable cause, using the pretext that the protesters had violated a state law proscribing obstruction of highways and public roads" in order to "intimidate" protesters and "disrupt the peaceful protests"[217] – a clear ulterior purpose. In service of that purpose, Defendants participated in the falsification of probable cause affidavits to support the unlawful arrests they had effected,[218] a "willful act in the use of the process not in the regular prosecution of the proceeding." [219];

### 7.  **Negligent Injury**

A plaintiff must establish four elements to plead a claim for negligent injury: "(1) the conduct in question was the cause-in-fact of the resulting harm; (2) defendant owed a duty of care to plaintiff; (3) the requisite duty was breached by the defendant; (4) the risk of harm was within

---

[215] *Id*. at 273.

[216] *Vasseur v. Eunice Superette, Inc*., 386 So.2d 692, 695 (La. App. 3 Cir. 1980), *writ denied*, 393 So.2d 747 (La. 1980).

[217] *Id*. at ¶ 3.

[218] *Id*. at ¶¶ 293-94 (Leroy and Deon Tennart); ¶¶ 304-05 (Eddie and Godavari Hughes); ¶¶ 330-33 (Brachell and Christopher Brown); ¶ 343 (Elcide Harris); ¶¶ 354-55 (Zachary Hill); ¶¶ 366-67 (Thomas Hutcherson).

[219] TAC at 41-42 ¶¶293-94 (Leroy and Deon Tennart); 44 ¶¶304-05 (Eddie and Godavari Hughes); 49-50 ¶330-33 (Brachell and Christopher Brown);.52 ¶¶342-43 (Elcide Harris); 53-54 ¶353-55 (Zachary Hill), 56 ¶¶365-67 (Thomas Hutcherson).

the scope of protection afforded by the duty breached."[220] "Police officers owe a duty of reasonableness when effecting an arrest or approaching a subject to disarm him.[221] "The use of force by law enforcement officers is tested by the 'reasonable force' standard established by . . . article 220."[222] "The use of excessive force transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for any injuries which result from the breach of the duty owed."[223]

In the instant case, as Plaintiffs have pleaded, (1) Defendants' conduct (i.e. the unlawful arrests, shows of force, and uses of force)[224] caused the resulting harm to Plaintiffs (i.e. Plaintiffs' physical and emotional injuries);[225] (2) Defendants owed a duty of reasonableness when effecting Plaintiffs' arrests; (3) Defendants breached that duty, both by arresting Plaintiffs without probable cause[226] and by using force far in excess of what was required to arrest Plaintiffs;[227] and (4) the risk of harm suffered by Plaintiffs – emotional and physical injuries suffered following physical attacks and capture by sworn law enforcement officers – was within the scope of the protection

---

[220] *Stroik v. Ponseti*, 96-2897, p. 6 (La. 9/9/97); 699 So. 2d 1072, 1077.

[221] *Manis v. Zemlik*, 11-799, p. 7 (La. App. 5 Cir. 5/8/12); 96 So. 3d 509, 513 (citing LA. CODE CRIM. PROC. art. 220; *Kyle v. City of New Orleans*, 353 So. 2d 969 (La. 1977))

[222] *Id.*

[223] *Id.*

[224] TAC ¶ 273.

[225] *Id.* ¶ 477.

[226] *Id.* ¶¶ 290–92 (Leroy and Deon Tennart); ¶¶ 299–301 (Eddie and Godavari Hughes); ¶¶ 316–17, 329 (Brachell and Christopher Brown); ¶ 339-342 (Elcide Harris); ¶¶ 347–53 (Zachary Hill); ¶¶ 360-63 (Thomas Hutcherson).

[227] *See, e.g.*, TAC ¶¶ 284–89 (describing members of multiple law enforcement agencies, including EBRSO and LPSO, blocking traffic, marching toward protesters with intimidating equipment, pushing protesters into the street with their batons, tackling Plaintiff Leroy Tennart and arresting him, and striking Plaintiff Deon Tennart in the face with a shield and arresting him.); ¶¶ 298–99 (describing how some or all of Defendants, including the EBRSO and LPSO defendants, blocked the path of protesters and began marching toward the protesters, leading to the arrest of Plaintiff Godavari Hughes by an unknown EBRSO deputy,); ¶ 311(describing multiple unknown officers, including some or all of the EBRSO and LPSO defendants, engaging with protesters by throwing them to the ground, brandishing firearms at them, rushing Plaintiffs Brachell and Christopher Brown from behind, tackling them to the ground and arresting them); ¶ 339 (describing the seizure of Plaintiff Elcide Harris by unknown defendants, including employees of the EBRSO); ¶ 349 (describing the tackling to the ground of Plaintiff Zachary Hill by unknown defendants which could include EBRSO defendants); ¶ 361–62 (describing the violent attack of unknown defendants, including potential EBRSO defendants, on Plaintiff Thomas Hutcherson and their aggressive arrest of him).

afforded by the duty breached (i.e. the duty to act reasonably when affecting arrest). Plaintiffs have thus sufficiently pleaded negligent injury as to Defendants.

## V.    Conclusion

This is no simple excessive force or false arrest case, in which one civilian claims to have been abused by one or a handful of police officers. Rather, in response to a large but peaceful protest, a number of law enforcement agencies took coordinated action to effect mass arrests on false charges, doing so in a manner which rendered it impossible for most of the arrestees to determine the identities of the law enforcement officers who abused and arrested them.

In this context, Plaintiffs have diligently attempted to determine the identities of the persons who violated the civil and constitutional rights of the Plaintiffs, and have further diligently and conscientiously crafted the Third Amended Complaint to encompass the multifaceted ways in which Defendants' conduct violated those rights. At this point in the case, discovery will disclose the actions each of the Defendants took in participating in the concerted action which resulted in the blatantly false arrests of the Plaintiffs and the myriad other violations of their rights which were so casually committed by the scores of Defendants sued in this case.

 Respectfully Submitted, this the 15th day of March, 2018.

FOR THE PLAINTIFFS:

/s/ Gideon T. Carter III

Gideon T. Carter, III, La. Bar No. 14136
Co-Lead Counsel
PO Box 80264
Baton Rouge LA 70898-0264
(225) 214-1546 (p) / (225) 341-8874 (f)
gideontcarter3d@gmail.com

/s/ Eric A. Foley

Eric A. Foley, La. Bar No. 34199
Roderick & Solange MacArthur
Justice Center (see above)
eric.foley@macarthurjustice.org

/s/ Emily Faye Ratner

Emily Faye Ratner, La. Bar No. 35289
7214 St. Charles Ave,
Campus Box No. 913
New Orleans, LA 70118
(504) 864-7861 (p) / (504) 861-5986 (f)
msemilyfaye@gmail.com

/s/ James W. Craig

James W. Craig, La. Bar No. 33687
Co-Lead Counsel
Roderick & Solange MacArthur
Justice Center
4400 S. Carrollton Avenue
New Orleans LA 70119
(504) 620-2259 (p) / (504) 208-3133 (f)
jim.craig@macarthurjustice.org

/s/ S. Mandisa Moore-O'Neal

S. Mandisa Moore O'Neal, La. Bar No. 35256
1824 Oretha Castle Haley Blvd.
New Orleans LA 70113
(504) 475-8046 (p)
smandisa85@gmail.com

/s/ Mauricio Sierra

Mauricio Sierra, La. Bar No. 35560
The Sierra Law Firm, LLC
7214 St. Charles Ave.
Campus Box 913
New Orleans, LA 70118
(504) 864-7860 (p)
msierra1@gmail.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed using the Court's CM/ECF filing system, which will provide electronic notice to all counsel of record.

This the 15th day of March, 2018.

/s/ James W. Craig